Opinion
 

 LORING, J.
 
 *
 

 Count I of the information charged Victor Wayne Gunnerson (Gunnerson), Edward Dean King (King), and Grover Michael Pumroy (Pumroy) with a violation of Penal Code section 187 (murder) on March 11, 1976, in that they did with malice aforethought murder Nathaniel Hersperger (Nathaniel). Count II charged the same defendants with a violation of Penal Code section 211 (robbeiy) on the same date against the same victim. King was charged with one prior—receipt of stolen property, which was found to be true. A jury found all three defendants guilty of murder in the first degree and guilty of robbeiy in the first degree. Their applications for probation and for new trial were denied, and they were sentenced to state prison for the term prescribed by law. The sentences were ordered to run concurrently and sentence on the robbery count was stayed pending completion of
 
 *373
 
 sentence on the murder count, and upon completion of sentence on the murder count, stay to be permanent. All defendants appeal from the judgment.
 

 Pretrial motions for appointment of a cardiologist to aid in the defense, to suppress confessions and motions under Penal Code section 995 to dismiss information were denied.
 

 Issues
 

 All appellants contend:
 

 I. The court abused its discretion in denying their request for the appointment of a cardiologist to aid the defense and to testify as an expert as to the cause of death.
 

 II. There was no probable cause for arrest and certain confessions were the fruit of that poisonous tree and should have been suppressed.
 

 III. Confessions were coerced and should have been suppressed.
 

 IV. There was a violation of
 
 Aranda
 
 principles
 
 {People
 
 v.
 
 Aranda
 
 (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]) by tiying the defendants jointly.
 

 V. The evidence was insufficient to establish cause of death as murder rather than a heart attack.
 

 Appellant Pumroy also contends:
 

 VI. The court abused its discretion in refusing to allow him to produce evidence regarding his use of drugs.
 

 VII. The court abused its discretion in refusing to allow him to substitute counsel.
 

 Facts
 

 Nathaniel and his brother, Wesley Hersperger (Wesley), attended the races at Los Alamitos Race Track the evening of March 11, 1976. At 10:30 or 11 p.m. they took a cab to their home on 7th Avenue in Long Beach; they believed that they each had about $400 cash when they left
 
 *374
 
 the track. The cab driver assisted them into their home since both were elderly and apparently had been drinking. Nathaniel suffered from a bad heart and used nitroglycerin. When they arrived home, Wesley found he had no money and Nathaniel had to use his own money to pay the cab fare of $8. Wesley could not find his wallet, returned to and searched the cab, and concluded it had been stolen at the track.
 

 After the cab driver departed, and while Wesley was on the front porch, two young men
 
 [1]
 
 holding long knives jumped on the front porch and pushed Wesley into the living room of the house. They relieved Wesley of his wallet
 
 [2]
 
 at knife point, and Wesley called Nathaniel (who was in the back of the house) saying they were being robbed. Nathaniel came running into the living room. Wesley apparently fled from the front room because Wesley thereafter “heard” a “scuffle” in the front room. The two men with the knives ran out of the house, and Wesley looked into the front room and saw Nathaniel lying on a couch. Nathaniel seemed to be “snoring” and he appeared to be unconscious. Wesley called police and an ambulance. When Police Officer Olds arrived, Nathaniel was not breathing, and his complexion was blue. Olds summoned paramedics who arrived in about two minutes. Nathaniel was not breathing and had no heart beat. The paramedics administered artificial respiration, cardropulmonary resuscitation and other first aid measures. Olds noticed Nathaniel’s empty wallet laying on the floor next to the couch. The paramedics revived Nathaniel’s heart so that it started beating in a slow irregular manner. They continued to massage the heart as they rushed Nathaniel to the hospital. Dr. William Hurst, M.D., examined Nathaniel at the hospital at 12:30 a.m. Hurst worked for 28 minutes in an effort to revive Nathaniel, after which Hurst pronounced Nathaniel dead. Hurst observed lacerations on Nathaniel’s right hand which appeared to be caused by a sharp instrument.
 

 Dr. Eugene Carpenter, M.D., deputy medical examiner, employed by the coroner testified for the People that as a result of an autopsy which he performed he was of the opinion that Nathaniel suffered from a badly diseased heart, which was two and one-half times normal size;
 
 *375
 
 that the heart was full of old scar tissue caused by old heart attacks; and that in his opinion . . the heart attack was directly due to the fear and exhaustion engendered by the scuffle” which occurred during the robbery.
 

 Defendants recalled Carpenter and he testified that nothing about the autopsy indicated that Nathaniel was in a stressful situation immediately before death; that in reaching his opinion regarding the cause of death, he relied on the coroner’s investigator’s report that Nathaniel had been “assaulted”;
 
 [3]
 
 that if Nathaniel had died in his sleep he would not have observed anything different in the autopsy; that he was “accepting [as true] the information of the coroner’s investigator”; that he did not think the investigator would lie and that he was accepting his statement as a fact; that there was no way that he could have inferred from the autopsy that Nathaniel “was under fear” “exhausted” or in a “stressful situation”; that a heart can fail for many reasons, that there is no way to predict when a heart will fail; that “[I]f the facts as I know them are contrary to the facts as they should be, the opinion alters. . . .” The assumed facts were that Nathaniel had been defending himself, that he had been assaulted and that he was under exertion. A hypothetical set of facts was submitted to Carpenter in which it was assumed that Nathaniel returned from the races, two men knocked on the door and entered the room, Nathaniel sat on a couch and “grasped a knife that was in close proximity to him cutting his hand” and Carpenter testified that he could not say “with reasonable medical certainty” that Nathaniel would not have died if the men had not shown up under those circumstances. “[UJnder those circumstances, I can’t see where the presence or absence of the men has anything to do with it”; that a “borderline heart” can “give away at any time.” The autopsy did not reveal any trauma to Nathaniel’s body except as a result of the attempts at resuscitation (by the paramedics and medical doctor); that Nathaniel had not been struck any traumatic or serious blow prior to death; that Nathaniel was not tested for anemia and that severe anemia can cause a heart to go into failure and there are many other factors which can cause heart failure; that serious arhythmia and heart failure can appear suddenly in the natural course of a preexisting arteriosclerotic diseased heart; that the “vast preponderance of all deaths by this mechanism are so-called spontaneous. They have no known contribution.” They can not only occur “without any exertion” “but most of the time it does”; that
 
 *376
 
 Nathaniel “had partly what might be called a stroke”; that “on top of the heart attack he did have a stroke, and that’s why he has been reported as having been snoring at some time.” Carpenter was asked the following questions and gave the following answers: “Q. And my last question to you, doctor, and then I’ll be quiet is : Keeping in mind the set of facts that I gave you—[¶] A. That you gave me? [¶] Q. Yes. [¶]—you could not say with reasonable medical certainty that the fact that this decedent was confronted by one or two men who asked him to give them money; that is, robbed him was the cause of his death; is that not so? [¶] A. Based on your set of facts, I could not.”
 

 Kraig Wright testified that he lived at a point across the street from Los Alamitos Race Track on March 11, 1976. He saw all three defendants at his home that night. At about 7 p.m. King told Wright that there were a couple of men at the track who were “loaded” and he was going to pull a “rip-off.” King tried to recruit Wright to drive the car, but Wright refused. King asked Wright to lend him a knife so he could “jimmy a window.” Wright refused to give King a knife but later found knives missing from the kitchen. When Wright confronted King with this fact, King said he would return them.
 

 Testimony at pretrial motions established that Wright reported these events to Los Alamitos police on April 8, 1976, and to Long Beach police on April 9, 1976. Long Beach police arrested Gunnerson on the street on April 12, 1976. After Gunnerson was fully advised of his
 
 Miranda
 
 rights and waived them, he told Officer Walton of the robbery of Nathaniel. After the arrest of Gunnerson and his confession, Pumroy was arrested, fully advised of his
 
 Miranda
 
 rights, and allegedly confessed, after which King (who was in Orange County jail on another offense) was interviewed and allegedly also confessed. For reasons hereinafter stated the validity of the confessions by Gunnerson and Pumroy and King was put in issue by pretrial motions. After hearing the trial court concluded that each confession by Gunnerson, Pumroy and King was free and voluntary, given after being advised of their
 
 Miranda
 
 rights, and after waiving
 
 Miranda
 
 rights, and testimonial evidence of each confession was received in evidence at trial after each of the confessions had been edited to remove any reference to any defendant other than the confessor.
 

 The People established that one of King’s fingerprints was found by police and lifted from a rear window of the Hersperger residence which was consistent with his confession that he tried to “jimmy” a rear window.
 

 
 *377
 
 The case was originally scheduled for trial on July 16, 1976. On that date at 9:40 a.m., King made a motion (in the Master Calendar Criminal Department before Judge Ellsworth M. Beam) for an order appointing Dr. Jack A. Patterson, cardiologist, at county expense to assist the defense in medical matters and to possibly testify as an expert witness. King stated that Patterson was going out of town for two weeks and that a 30-day continuance would be necessaiy. The prosecutor suggested that if the court was going to grant the motion, that the court appoint the expert from the court’s “panel of cardiologists.” The court indicated that it had no such panel. King’s counsel explained that he had been advised that a pathologist (such as Carpenter) was not qualified to express an opinion as to the causative factors of the heart attack and that King was indigent. Gunnerson and Pumroy joined in the motion. The court denied the motion on the ground that there was “an insufficient showing”; that if the trial judge found that the pathologist was unqualified, the People’s case would fail thereby inferentially ruling that if the trial judge found that the pathologist was qualified to express an opinion as to the cause of death (which is what, in fact, occurred), then a cardiological expert would be unnecessary, Defense counsel complained that without a cardiological expert they would not be in a position to challenge that a pathologist is not a qualified expert; that two cardiologists (Dr. Jack Patterson and Dr. Edgar Palorea) had advised him that a pathologist could not say “with reasonable medical certainty that a heart attack was caused by fright” “and we would not be in a position to even challenge that opinion if we didn’t have the benefit of a cardiologist.” The prosecutor argued that if the opinion of the pathologist is not reasonable “defense counsel can attack the qualifications and attack the opinion rendered by the pathologist at the time of trial.” The defense replied that defense counsel could only ask questions; they could not testify; and if they did not have their own expert who could challenge the pathologist’s testimony, they would be at a disadvantage, and that each of the defendants is entitled to the qualitative judgment of their own cardiological expert as to whether the robbery was the cause of the heart attack and resultant death; that “. . . we cannot present anything on any of those issues without medical help.”
 

 The court denied the motion on two grounds: (1) “. . . there has not been an adequate showing” and (2) “[T]he case is set for trial today.” The trial did not actually commence until July 21, 1976, at 2:30 p.m.
 

 The motion was renewed in the trial department and denied.
 

 
 *378
 
 Discussion
 

 We conclude that it was an abuse of discretion for the trial court to deny the defendants’ motion for the appointment of a cardiological expert to assist in advising the defense and in testifying as an expert for the defense as to the cause of the death of Nathaniel.
 

 It would appear to be axiomatic that the first and primaiy issue for the People to establish in a murder case is that a murder has, in fact, occurred. Murder is the unlawful “killing” of a human being with malice aforethought. (Pen. Code, § 187.)
 

 While it is true that under California law there is no strict requirement of “causation” between a “killing” and the commission of a felony under the felony-murder rule under Penal Code section 189
 
 (People
 
 v.
 
 Chavez
 
 (1951) 37 Cal.2d 656, 669 [234 P.2d 632];
 
 People
 
 v.
 
 Whitehorn
 
 (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783]), section 189 does require a “killing” in the perpetration of one of the designated felonies. A simultaneous or coincidental “death” is not a “killing.” It has been held in California that death from a heart attack during the course of a robbery is murder if “. . . but for the robbery the victim would not have experienced the fright which brought on the fatal heart attack.”
 
 (People
 
 v.
 
 Stamp
 
 (1969) 2 Cal.App.3d 203, 209 [82 Cal.Rptr. 598].) It would, therefore, seem obvious conversely that if death would have occurred despite the robbery, the death is not a “killing” which would constitute “murder.” In
 
 Stamp,
 
 there was a conflict in the medical testimony of medical experts on both sides regarding the cause of death. In the case at bar there was no such conflict but presumably only because of the court’s denial of the defense motion for funds with which to employ a cardiological expert.
 

 It is also established law in California that when an accomplice dies “accidentally” while committing arson, such death is not a “killing” within the meaning of Penal Code, section 189.
 
 (People
 
 v.
 
 Ferlin
 
 (1928) 203 Cal. 587, 597 [265 P. 230], discussed at length in
 
 Woodruff
 
 v.
 
 Superior Court
 
 (1965) 237 Cal.App.2d 749, 750-752 [47 Cal.Rptr. 291].)
 

 Defendants were entitled to prove, if they could, that the death of Nathaniel was merely “simultaneous” or “coincidental” to the robbery; that the robbery was not legally related to the death; and, therefore, that they were not guilty of a “killing” within the meaning of Penal Code section 189.
 

 
 *379
 
 If there was no legal relationship between the robbery and the death of Nathaniel, then the defendants cannot be convicted of murder.
 

 The Sixth Amendment right to counsel is a meaningless gesture if counsel for an indigent defendant is denied the use of working tools essential to the establishment of what would appear to be a tenable or possible defense. In
 
 Torres
 
 v.
 
 Municipal Court
 
 (1975) 50 Cal.App.3d 778, 783-785 [123 Cal.Rptr. 553], the court said: “It is settled that the right to counsel guaranteed by the Sixth Amendment, to the United States Constitution is binding upon the states. If a defendant is indigent the states must appoint counsel to assist his defense. [Citation.] The right to counsel includes the right to the use of experts such as psychiatrists or psychologists or any other expert that will assist counsel in preparing a defense. [Citations.]. ... [¶] We start with the basic premise that there can be no justice where the type of trial that a person has depends upon the financial means of such person. [Citation.] By statute the federal courts are required to appoint expert witnesses for the defense if the witness is necessary to an adequate defense. [Citations.] This state does not have a similar provision. However, we note that the federal statute was passed as a result of equal protection problems that had arisen. [Citations.] [¶] Although there is no statute that specifically covers the appointment of an expert for the defense other than for the purposes of an insanity plea (see Evid. Code, §§ 1016, 1017) there can be no question that equal protection demands that in a proper factual situation a court must appoint an expert that is needed to assist an indigent defendant in his defense.” (To the same effect see
 
 State
 
 v.
 
 Green
 
 (1969) 55 N.J. 13 [258 A.2d 889];
 
 State
 
 v.
 
 Hancock
 
 (Iowa 1969) 164 N.W.2d 330, 333;
 
 People
 
 v.
 
 Irvine
 
 (1972) 40 App.Div.2d 560 [334 N.Y.S.2d 502, 503-504];
 
 People
 
 v.
 
 Watson
 
 (1966) 36 Ill.2d 228 [221 N.E.2d 645].)
 

 Here the testimony of Carpenter was at least borderline. Assuming, without deciding, that Carpenter was competent to express an opinion on a subject within the expertise of a cardiologist, the validity of his opinion rested entirely upon the validity of his information that Nathaniel had been “assaulted” by the robbers. Even he admitted that if no “assault” had occurred, then the death would have been merely coincidental with the robbery. There was no direct evidence that the robbers “assaulted” Nathaniel. The only direct evidence which could have suggested such an inference was that Wesley heard a. “scuffle” but such evidence necessarily did not establish the cause, nature or extent of the “scuffle” or who was engaged in it. In our view, therefore, the People’s evidence that the
 
 *380
 
 robbery was the cause of the heart attack and resultant death was not so overpowering and overwhelming that we can say to a moral certainty that the denial of the defense motion for the appointment of an expert was not prejudicial.
 

 The trial court denied the motion, inter alia, because there was “no adequate showing.” We assume this means that there was no adequate showing of necessity. In our view, the prosecution’s borderline evidence in and of itself demonstrates the necessity. The court demonstrated a lack of adequate appreciation for the problem when it said that if the pathologist was not competent to testify as to the cause of death the People would fail to establish a case. The court failed to consider the other side of the coin that if the pathologist was competent to testify as to the cause of death, the defendants had an even greater need for expert assistance and testimony to prove that the opinion of the pathologist was erroneous. If only one side is permitted to produce evidence on a critical issue, the court deprives
 
 itself
 
 of the benefits of our adversary system which is the surest guarantee for the discovery of truth. We cannot hold ás a matter of law as the trial court inferentially did that there can be but one medical expert to explain the cause of death under these circumstances. If there were two or more possible medical explanations for the cause of death, the trier of fact was entitled to weigh and consider each and all of such opinions.
 

 Respondent here seeks to justify the ruling of the trial court on the ground that the defendants were not indigent. Pumroy was judicially found to be indigent since the court appointed counsel for him as an indigent. King and Gunnerson also had appointed counsel as indigents at the outset of the case, although later on they had private counsel. At the time of the motion, King’s counsel represented to the court that King was indigent. The court did not deny the motions on the ground that the defendants were not indigent but on other grounds not legally tenable. If denial was to be based on the ground that the defendants were not indigent, then we think the trial court should have ordered a hearing to resolve that issue of fact. Assuming, without deciding, that Gunnerson was not indigent, he nevertheless would be entitled to the benefit of the testimony and assistance of any such cardiological expert which the court might have appointed for the indigent defendants, since Gunnerson was jointly tried with them.
 

 The record here is clear that the motion was denied because of the court’s erroneous belief that the assistance of an expert was not needed
 
 *381
 
 by the defense, and because the motion was made “on the day of trial.” However, the case did not actually go to trial until one week after the motion was made and denied. Although we do not condone the lack of diligence of defense counsel, we conclude that in view of the nature of the charge and the nature of the medical problem, the court should have exercised extreme care in making certain that the ultimate truth was fairly established.
 

 The bottom line is that these defendants face a life sentence in prison because of a death which a trier of fact might have concluded was not a “killing” within the meaning of Penal Code section 189 and, therefore, not a “murder” if the defendants had been allowed to obtain appropriate expert assistance and testimony.
 

 We conclude that on this ground alone we are required to reverse the judgment on count I (murder).
 

 We have carefully considered appellants’ contentions that the trial court should have suppressed each of their confessions. The keystone of their argument is that there was no legal cause for a warrantless arrest because Wright was not a reliable informant. Wright was a “citizen informant” who was a precipient witness to the acts, conduct and planning of the defendants in their preparation to commit the robbery. One of the defendants even attempted to recruit Wright as the driver of the car. The evidence which Wright supplied was entirely consistent with evidence already in the possession of police. According to Officer Terry Walton’s testimony information supplied by Wright “sounded good to us at the time because of our knowledge from the original night the crime went down” “It seemed like his information fit right into the scope of the crime.” Wright was a citizen informant whose statements were sufficiently corroborated to provide legal cause for the arrest of Gunnerson.
 
 (People
 
 v.
 
 Duren
 
 (1973) 9 Cal.3d 218, 240 [107 Cal.Rptr. 157, 507 P.2d 1365];
 
 Krauss
 
 v.
 
 Superior Court
 
 (1971) 5 Cal.3d 418, 421-422 [96 Cal.Rptr. 455, 487 P.2d 1023];
 
 People
 
 v.
 
 Abbott
 
 (1970) 3 Cal.App.3d 966, 970-971 [84 Cal.Rptr. 40].)
 

 Gunnerson’s arrest, being for probable cause and therefore lawful, his subsequent, free, voluntary and informed confession provided additional probable cause for the subsequent arrest of Pumroy and King.
 

 Pumroy’s additional contention that his confession was coerced was based upon conflicting evidence which the trial court resolved against
 
 *382
 
 him. Pumroy contends that his confession should have been suppressed because there were no exigent circumstances for his warrantless arrest at his home citing
 
 People
 
 v.
 
 Ramey
 
 (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333]. Pumroy contends that reversal of the judgment on count II (robbery) as to Pumroy is required under
 
 Brown
 
 v.
 
 Illinois
 
 (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254]. However,
 

 these contentions were not made in the trial court and are made for the first time on appeal. Pumroy is now precluded from raising the point for the first time on appeal.
 
 (People
 
 v.
 
 Welch
 
 (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217, 501 P.2d 225];
 
 People
 
 v.
 
 Talley
 
 (1967) 65 Cal.2d 830, 837-838 [56 Cal.Rptr. 492, 423 P.2d 564];
 
 People
 
 v.
 
 Payne
 
 (1969) 1 Cal.App.3d 361, 364-365 [81 Cal.Rptr. 635].)
 

 We have also carefully considered appellants’ contention that there was
 
 Aranda
 
 error
 
 {People
 
 v.
 
 Aranda, supra,
 
 63 Cal.2d 518) but conclude that it cannot be sustained because the confession of each defendant was properly edited.
 

 Finding no further prejudicial error in the record, we conclude that the judgment should be reversed on count I (murder) and affirmed on count II (robbeiy).
 

 The judgment is affirmed on count II (robbery) as to each defendant, and the judgment is reversed on count I (murder) as to each defendant.
 

 Potter, Acting P. J., and Allport, J., concurred.
 

 *
 

 Assigned by the Chairperson of the Judicial Council.
 

 [1]
 

 Wesley was unable to identify the two men at the preliminaiy hearing. However, he identified the two men at trial as defendants Gunnerson and Pumroy. However, confessions indicated that the two were Gunnerson and King and that Pumroy drove the car.
 

 [2]
 

 We have difficulty understanding how the robbers could have taken Wesley’s wallet at knife point at his home if he had “lost” it at the track. However, he also testified that they arrived at the track with $200 and left with $400 and “[wje compared it in the cab and we knew we was ahead.”
 

 [3]
 

 Defendants claim that Nathaniel was not “assaulted” (in the sense of an assault and battery) and there is no evidence that the robbers touched the body of Nathaniel in any way other than the fact that Nathaniel reached out with his hand and grabbed the knife, thereby cutting his hand.