Opinion
 

 TAYLOR, P. J.
 

 Defendant, Steven Clair Wischemann, appeals from a judgment of conviction entered on a jury verdict finding him guilty of four counts of robbery (Pen. Code, § 211), while armed (Pen. Code, § 12022, subd. (a)) and using a firearm (Pen. Code, § 12022.5) during the commission of each offense. Defendant contends that: 1) he is entitled to a new trial on the issue of sanity in light of
 
 People
 
 v.
 
 Drew,
 
 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], decided after the trial of this matter; 2) the trial court erred by failing to exclude his confession, which was involuntary as a matter of law; 3) his conviction on two counts pursuant to Penal Code section 12022.5 violates Penal Code section 654, as the robberies were part of a single criminal transaction; and 4) he is entitled to 155 days’ credit for time served before trial. The People concede that defendant cannot suffer both arming and use enhancements for the same offense and that the matter must be remanded for the trial court’s determination of the credit for time served issue. For the reasons set forth below, we have concluded that in all other respects, the judgment must be affirmed.
 

 
 *166
 
 Viewing the record most strongly in favor of the judgment, as we must, the following chronology of pertinent facts appears:
 

 On August 2, 1977, at 6 a.m., defendant entered a 7-11 store on West Steele Lane in Santa Rosa. He pointed a small silver handgun at the clerk, Michael Bunyard, and demanded money from the cash registers. His face was concealed by a hooded mask with holes cut for eyes. Bunyard complied with defendant’s demands and emptied all of the money from the cash registers into a pillowcase carried by defendant. Defendant then ordered Bunyard into the store’s rear room, and left.
 

 A customer, Melody Culver, who approached the store about 6 a.m., noticed a young, bearded man leave the store carrying an object the size of a shopping bag. The young man entered an old red pickup truck equipped with a homemade camper shell and a spotlight, and drove off. On August 5, 1977, Ms. Culver viewed a lineup and tentatively identified defendant as the young man she had seen.
 

 On August 4, 1977, at 2:30 a.m., Michael Atchison, the attendant of a Union 76 gas station on College Avenue in Santa Rosa, was talking to a customer, LaFranchi, in the station’s enclosed office. Defendant entered wearing a faded purple T-shirt mask with holes cut for eyes. He was holding a silver handgun with white handles. He pointed the gun at Atchison and LaFranchi, indicated that it was a robbery, and directed both to climb over the counter. Defendant then ordered Atchison to open a floor safe. As Atchison had a key to only one portion of the safe, he was unable to open it completely. Defendant then took the key from him and attempted to open it himself. He also ordered Atchison to get the money from the cashbox near the pumps, and place it in a white pillowcase. When Atchison returned to the office, he noticed that defendant had pulled his mask down. At Atchison’s entrance, defendant readjusted his mask, took $10 from Atchison’s wallet, and fled with the pillowcase. As defendant departed, he told Atchison and LaFranchi to keep their heads down and to tell the police about the red pickup with the spotlight on top. Atchison called the police and subsequently identified defendant as the robber.
 

 About an hour later the same day, defendant entered a 7-11 store on Maple Avenue in Santa Rosa wearing a pink mask over the lower portion of his face. He pointed a small chrome gun at the store’s clerk, Craig Sulli, and said: “This is it,” handed Sulli a pillowcase and told him to empty the contents of the store’s cash registers. Sulli complied by placing
 
 *167
 
 currency, coins, food stamps and a number of packs of Marlboro cigarettes into the pillowcase. Defendant then asked to see Sulli’s wallet. Sulli indicated that he had only $2. Defendant then reached into the pillowcase and handed Sulli a $5 bill. Defendant next took Sulli to the back room and directed him to remain while defendant attempted to open the store’s floor safe. Defendant was able to remove a canvas bank deposit bag containing rolled coins. Meanwhile, a customer, Senter, entered the store. Defendant took him to the back room at gunpoint and asked for his wallet. Senter handed defendant about $37. Subsequently, Senter identified defendant as the robber.
 

 About 3:30 a.m., on August 4, 1977, Officer Joseph Deese of the Santa Rosa Police Department heard a police radio broadcast concerning the second 7-11 robbery. When he saw a red vehicle driven by a person matching the description of the alleged robber, he pulled it over. Defendant stepped out of the auto with his wallet in his hand, produced identification, and told the officer that he was coming from a 7-11 store. Deese observed defendant’s car and arrested defendant for armed robbery. During a subsequent search of the car, the police found a pillowcase containing money and food stamps, rolled coins, a Bank of America money bag, and packages of cigarettes. Twenty-two caliber ammunition in a paper bag and a loaded, chrome-plated .22 caliber revolver were found in the front seat.
 

 Defendant was then taken to the police station and duly advised of his rights by Detective Radley. Defendant acknowledged that he understood, but hesitated when asked if he wished to make a statement. Radley terminated the interview and left the room. Defendant then asked Deese, who was also present, about Radley. Deese replied that if defendant wanted to make a statement, Radley was a fair and respected officer. After defendant indicated his willingness to discuss the crimes, Radley was summoned and readvised defendant of his rights. Defendant confessed to all three robberies in Santa Rosa but denied involvement in any other offenses.
 

 Defendant first contends that our Supreme Court’s decision in
 
 People
 
 v.
 
 Drew, supra,
 
 22 Cal.3d 333, decided after the instant trial, requires a reversal here, as it applied the ALI insanity test retroactively to cases where a plea of not guilty by reason of insanity was entered (p. 348;
 
 People
 
 v.
 
 Stewart,
 
 89 Cal.App.3d 992, 1000 [153 Cal.Rptr. 242]).
 

 
 *168
 
 Obviously, in view of the fact that
 
 Drew
 
 was decided subsequent to the jury trial in the instant case, neither the expert witnesses nor counsel structured their presentation at the trial (nor was the jury instructed) in terms of the ALI test. However, as we understand
 
 Drew,
 
 failure to apply the ALI test is not reversible per se. Thus, we must examine the record and determine whether the alleged error was prejudicial under California Constitution article VI, section 13 (see
 
 In re Ramon M., 22
 
 Cal.3d 419, 431 [149 Cal.Rptr. 387, 584 P.2d 524]), i.e.,
 
 whether it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error.
 

 In rejecting the M’Naghten test
 
 [1]
 
 in favor of the ALI standard,
 
 [2]
 
 our Supreme Court focused on the need for the addition of a volitional element to the M’Naghten test’s exclusive emphasis on cognition
 
 (Drew, supra,
 
 p. 346). The court recognized that an individual may have an intellectual understanding of right and wrong and yet be unable to conform his behavior to that knowledge. The court selected
 
 Drew
 
 to adopt the new rule because of its peculiar facts
 
 (Drew,
 
 p. 339, fn. 4). The record in that case indicates that Drew was a former mental patient who had been committed to mental hospitals on two occasions prior to his arrest. He had a history of irrational assaultive behavior and was diagnosed as suffering from latent schizophrenia “characterized by repeated incidents of assaultive behavior and by conversing with inanimate objects and nonexistent persons”
 
 (Drew,
 
 p. 338). Both of the court-appointed psychiatrists who also had examined Drew during his earlier commitments agreed that Drew’s mental condition was such that he was unable to appreciate the wrongful nature of his acts. The jury, instructed pursuant to the M’Naghten test, did not believe their testimony and found him sane. The prosecution presented no evidence at the sanity trial. Our Supreme Court concluded, however, that there was “substantial evidence” of incapacity under the ALI criteria, as Drew’s pattern of repetitive irrational assaults suggests the likelihood that he is unable to control his behavior or to conform to legal requirements
 
 (Drew,
 
 p. 351). The facts of the other authorities cited in
 
 Drew
 
 were similarly susceptible to the application of the ALI test
 
 (People
 
 v.
 
 Gorshen,
 
 51 Cal.2d 716 [336
 
 *169
 
 P.2d 492];
 
 People
 
 v.
 
 Wolff,
 
 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959];
 
 People
 
 v.
 
 Robles,
 
 2 Cal.3d 205 [85 Cal.Rptr. 166, 466 P.2d 710]), as each involved violent criminal activity motivated by delusions and uncontrollable rages. Under such factual situations, “[t]o ask whether ... a person knows or understands that his act is ‘wrong’ is
 
 to ask a question irrelevant to the nature of his mental illness or to the degree of his criminal responsibility'' {Drew, supra,
 
 p. 342; italics added).
 

 The instant case, however, presents a significantly different factual situation. Defendant had no prior history of mental illness or inability to act in a socially acceptable manner. He committed simple garden variety robberies without exhibiting any type of uncontrolled or aberrant behavior. Rather, he exhibited a considerable degree of logic, planning
 
 [3]
 
 and consistency. Moreover, all of the complaining witnesses unanimously indicated that defendant was completely calm and coherent during the commission of each robbery. No one detected any signs of intoxication or drug use or bizarre behavior. All agreed that defendant moved in a coordinated and physically dexterous manner. Under
 
 Drew,
 
 the accused retains the burden of proof on the issue of insanity (p. 348). Defendant here, as a matter of law, failed to meet that burden. In fact, the type of conduct exhibited by defendant here has generally been regarded by the courts as evidence of sanity
 
 (People
 
 v.
 
 Wolff, supra,
 
 61 Cal.2d p. 805; see also cases cited at pp. 805-806). Given the totality of circumstances, we see no reasonable possibility that additional proceedings could adduce any new evidence that would convince a jury that defendant’s intellectual capacity was so affected by mental illness that he was unable to prevent himself from engaging in these robberies
 
 {People
 
 v.
 
 Drew, supra,
 
 p. 351; cf.
 
 People
 
 v.
 
 Phillips,
 
 90 Cal.App.3d 356, 366 [153 Cal.Rptr. 359]).
 

 In
 
 Drew,
 
 our Supreme Court emphasized the inadequacy of applying the M’Naghten standard to the peculiar facts of that case. There, the People presented no evidence on the sanity issue; the jury was instructed that defendant had the burden of proving insanity by a preponderance of the evidence and concluded that Drew was sane. The Supreme Court
 
 *170
 
 opined that the verdict was the result of the M’Naghten rule’s
 
 rigid emphasis on cognition.
 
 “In sum, inadequacy of the expert evidence to prove insanity under the M’Naghten rule is essentially the result of the fact that M’Naghten requires
 
 proof of a subjective cognitive state which is largely unrelated to the reality of mental
 
 illness”
 
 (Drew,
 
 p. 351; italics added). The court concluded that in the absence of prosecution evidence on the sanity issue,
 
 it was probable that a verdict of insanity would have been returned if the case had been tried and the jury instructed pursuant to the ALI standard.
 
 This is not true here.
 

 In the instant case, the psychiatric testimony at the trial was, as usual, sharply divided. The defense psychologist, Dr. Paradis, and the defense psychiatrist, Dr. Peal, agreed that defendant was psychotic; Dr. Peal believed that defendant was also schizophrenic. Dr. Peal testified that defendant’s psychosis was typified by poor judgment, impulsiveness, inability to plan, and impairment of memory; he further opined that these conditions were exacerbated by use of alcohol and drugs. Dr. Peal’s diagnosis was disputed by the prosecution psychiatrist, Dr. Byledbal, who agreed that defendant was depressed, but rejected the diagnosis of schizophrenia and also opined that certain instances of defendant’s alleged loss of memory and drug use may have been either exaggerated or feigned.
 
 [4]
 
 Despite the extensive and wide ranging testimony on defendant’s psychiatric and emotional state,
 
 [5]
 
 no mention was made of delusions, hallucinations, brain damage or uncontrollable impulses or rages that would negate defendant’s will and impel him to commit armed robberies.
 
 [6]
 
 We note that the defense did not request instructions on irresistible impulse in the guilt phase of the trial
 
 (People
 
 v.
 
 Cantrell,
 
 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]) where diminished capacity was an issue.
 

 Accordingly, we cannot conclude here, as the court did in
 
 Drew, supra,
 
 that the jury’s finding of sanity was the erroneous product of the overly restrictive M’Naghten test. Given the extensive and conflicting testimony concerning defendant’s mental condition, and the totality of the remain
 
 *171
 
 ing evidence, we do not believe that it is reasonably probable that defendant would have been found insane, even if the jury had been instructed pursuant to the ALI test
 
 (People
 
 v.
 
 Wagoner,
 
 89 Cal.App.3d 605, 613 [152 Cal.Rptr. 639]). We note that other Courts of Appeal have reached similar conclusions in several published opinions where, as here, the trial occurred prior to
 
 Drew (Wagoner, supra; People
 
 v.
 
 Stewart, supra,
 
 89 Cal.App.3d p. 1000; but cf.
 
 People
 
 v.
 
 Phillips, supra,
 
 90 Cal.App.3d pp. 365-367).
 

 Defendant next contends that the trial court’s failure to exclude his confession constitutes reversible error as it was obtained by promises of leniency and was, therefore, involuntary as a matter of law. He further argues that in light of
 
 People
 
 v.
 
 Jimenez,
 
 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], which requires the People to prove voluntariness beyond a reasonable doubt, the wrong standard of proof was utilized at his suppression hearing.
 

 We turn first to the issue of voluntariness. In doing so, it is our duty to examine the uncontradicted facts to determine independently whether the trial court’s conclusion of voluntariness was properly found
 
 (People
 
 v.
 
 Jimenez, supra,
 
 p. 609;
 
 People
 
 v.
 
 Gordon,
 
 84 Cal.App.3d 913, 924 [149 Cal.Rptr. 91]). Where there is conflicting testimony, “ ‘. . . we accept that version of the events which is most favorable to the People, to the extent that it is supported by the record’ ”
 
 (Jimenez, supra,
 
 p. 609).
 

 Defendant maintains that the interrogating police officers used promises of leniency to induce him to confess. He relies on two instances in which lenient treatment was offered by implication. First, he asserts that Radley intimated that any cooperation received would be reflected in the police report to be submitted to the court. Radley testified that he advised defendant of the charges against him and mentioned that cooperation would be noted in his reports. He denied, however, that any advantage or benefit was either explicitly or impliedly promised to defendant.
 

 The People point out that a similar exchange occurred in
 
 People
 
 v.
 
 Donovan,
 
 272 Cal.App.2d 413, 417 [77 Cal.Rptr. 285] and the court held that no promises of leniency were made. We agree. The conversation in the instant case, taken as a whole, shows no attempt on the part of the police to unduly influence defendant. The record indicates that Radley told defendant that he was dealing with “truth and honesty” and that his responsibility was twofold, to prove defendant’s innocence or guilt.
 
 *172
 
 Advice or exhortation to tell the truth does not, in itself, render a subsequent confession involuntary
 
 (People
 
 v.
 
 Hill,
 
 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]).
 

 We note also that the initial interview between defendant and the police officers lasted only four or five minutes and that it was terminated promptly when defendant intimated that he did not wish to make a statement.
 

 Defendant also claims that a second implied promise of leniency was made by Deese in response to a question posed by defendant. The record indicates that after Radley left the interview room, defendant asked Deese what sort of person Radley was; Deese replied that Radley was a fair man and that it might be “advantageous”
 
 [7]
 
 for defendant to speak with Radley
 
 if defendant was going to speak to anyone.
 
 The context of the conversation indicates that Deese was expressing his own opinion of Radley’s competence as an investigator and a detective. Thus, the record indicates that the decision of whether or not to speak to Radley was clearly left to defendant and no promises or inducements were offered to secure his statement. The fact that Deese expressed the opinion that it might be better to talk to one who was fair and held in high regard rather than someone else, in the context of the brief conversation, did not come close to overreaching or coercion on the part of Deese. The record further indicates that defendant was neither of tender years nor was his intelligence impaired
 
 [8]
 
 (see
 
 In re Anthony J.,
 
 86 Cal.App.3d 164, 171 [150 Cal.Rptr. 183]).
 

 Moreover, inducements or threats must be the motivating cause of a confession before it will be deemed involuntary as a matter of law
 
 (People
 
 v.
 
 Brommel,
 
 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 346 P.2d 845];
 
 People
 
 v.
 
 Hill, supra,
 
 66 Cal.2d 548). Here, the two statements made by the police officers permit a variety of inferences but fall far short of inducement. Defendant’s own testimony is equivocal in terms of what specific benefits or leniencies were promised him. The brevity of the interrogation and the
 
 *173
 
 fact that defendant initiated the confession, coupled with the officers’ consistent denial of coercion, precludes us from reversing the trial court’s finding of voluntariness.
 

 In the alternative, defendant contends that the trial court erred in failing to require the People to prove the voluntariness of his confession beyond a reasonable doubt
 
 (People
 
 v.
 
 Jimenez, supra,
 
 p. 595).
 
 [9]
 
 We cannot assume that the trial court applied the correct standard where, as here, the record is silent on the subject
 
 {In re Anthony supra,
 
 p. 171;
 
 People
 
 v.
 
 Walker,
 
 83 Cal.App.3d 619, 621 [148 Cal.Rptr. 66]). However, since the voluntariness of a confession relates only to a preliminaiy fact, the effect of any such error must be measured by the standard of
 
 People
 
 v.
 
 Watson,
 
 46 Cal.2d 818, 837 [299 P.2d 243],
 

 It is uncontroverted that defendant was informed of his rights under
 
 Miranda
 
 on two occasions prior to his confession and he indicated his understanding of those rights. The issue before the trial court was ultimately one of credibility
 
 (People
 
 v.
 
 Walker, supra,
 
 83 Cal.App.3d 621). Given the demeanor and testimony of the witnesses, the trial court here chose to disbelieve defendant. Extensive testimony amply supports that decision. In light of the totality of the evidence, we do not believe that it is reasonably probable that defendant’s confession would have been found involuntary if the court had used the beyond a reasonable doubt standard rather than the preponderance of the evidence standard. Thus, the trial court’s finding of voluntariness must be sustained and defendant’s confession was properly admitted.
 

 Defendant also contends that the multiple finding that he used a firearm in the last of the four robberies charged (Pen. Code, § 12022.5) was prohibited by Penal Code section 654.
 
 [10]
 
 Defendant urges that since the robbery of Senter occurred during the progress of the Maple Avenue 7-11 (Sulli) robbery, there was but a “single use” of a firearm. Our Supreme Court held in
 
 In re Culbreth,
 
 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], that “if all the charged offenses are incident to one objective and effectively comprise an indivisible transaction, then section 12022.5
 
 *174
 
 may be invoked
 
 only once and not in accordance with the number of victims.'’'’
 
 (Pp. 333-334; italics added.)
 

 We do not find persuasive defendant’s contention that the robberies of the 7-11 stores and Senter stem from a single objective and were, therefore, indivisible. The record indicates that Senter entered the store after defendant had removed money from the cash registers as well as merchandise and closeted Sulli, the clerk, in the back room. When Senter entered, defendant was in the front of the store attempting to open the floor safe. Nothing in this course of action impelled the further robbery of Senter who entered as a customer. The robbery of Senter was not related to defendant’s goal of opening the safe but was simply an additional act perpetrated against another victim who appeared on the scene by chance.
 

 We, therefore, conclude that the trial court correctly calculated the term of defendant’s sentence pursuant to Penal Code section 1170.1
 
 [11]
 
 and that there has not been a multiple punishment in violation of Penal Code section 654.
 

 Finally, defendant contends that he was improperly deprived of 155 days’ credit for the time he served in the Santa Rosa County jail prior to sentencing. We agree that Penal Code section 2900.5, set forth below, as amended,
 
 [12]
 
 requires that
 
 all
 
 days of custody must be credited to a
 
 *175
 
 defendant’s sentence upon conviction of a felony. The record on appeal, however, does not contain competent evidence of the duration of defendant’s incarceration. Accordingly, we are unable to resolve this matter» and must remand the matter to the trial court. “If the credit authorized by Penal Code section 2900.5 depends upon a disputed issue of fact we see no reason why that disputed question may not be presented, on motion and notice, for resolution to the court which imposed the sentence and which has ready access to the information necessary to resolve the dispute”
 
 (People
 
 v.
 
 Hyde,
 
 49 Cal.App.3d 97, 102 [122 Cal.Rptr. 297]; see also
 
 People
 
 v.
 
 Knight,
 
 57 Cal.App.3d 515, 519-520 [129 Cal.Rptr. 259]).
 

 We turn briefly to defendant’s contention that he cannot suffer both armed (Pen. Code, § 12022) and use (Pen. Code, § 12022.5) enhancements for the same offense. The People concede that the lesser of the two enhancements (Pen. Code, § 12022) must be stricken from the judgment.
 
 [13]
 
 A finding of use of a firearm necessarily includes an armed finding, and the defendant may not be penalized for both
 
 (People
 
 v.
 
 Bennett,
 
 60 Cal.App.3d 112, 121 [131 Cal.Rptr. 305];
 
 People v. Johnson,
 
 81 Cal.App.3d 380, 390 [146 Cal.Rptr. 476]). Accordingly, the judgment is modified to strike the reference to Penal Code section 12022.
 

 
 *176
 
 We conclude that the reference to Penal Code section 12022 enhancements must be stricken from the judgment and the matter remanded for a redetermination of the credit for time served issue. In all other respects, the judgment is affirmed.
 

 Kane, J., and Rouse, X, concurred.
 

 A petition for a rehearing was denied July 6, 1979, and appellant’s petition for a hearing by the Supreme Court was denied August 22, 1979.
 

 [1]
 

 “ ‘Legal insanity . . . means a diseased or deranged condition of the mind which makes a person incapable of knowing or understanding the nature and quality of his act, or makes a person incapable of knowing or understanding that his act was wrong.’ ”
 
 (Drew,
 
 p. 339.)
 

 [2]
 

 Under the ALI standard,
 
 “A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality
 
 [wrongfulness] of his conduct
 
 or to conform his conduct to the requirements of law.” (Drew,
 
 p. 336, fn. 3; italics added.) Thus, there are two prongs to the present California test for insanity: 1) cognitive; and 2) volitional.
 

 [3]
 

 As indicated above, each robbery occurred in the very early morning hours when business is slow. In each instance, defendant wore a mask to conceal his identity. He methodically announced his purpose and took money from both cash registers and the people on the premises; he made concerted efforts to gain access to safes. He rejected pennies and nickels and directed Sulli to lift the change tray out of the register in an effort to discover larger bills. He requested a specific brand of cigarettes. In each instance, he carried a loaded gun, provided a pillowcase for the loot, and did not harm the victims. Thus, apart from the expert testimony, there was no evidence that defendant lacked substantial capacity either to appreciate the criminality of his conduct or conform his conduct to the requirements of the law.
 

 [4]
 

 Defendant claimed to have ingested numerous capsules of Demerol and described the color of the capsules. Dr. Byledbal, however, testified that Demerol is not manufactured in capsule form.
 

 [5]
 

 A number of defense witnesses indicated that at the time of the robberies, defendant was depressed and his behavior was secretive and that there were lapses of memory and disheveled appearance as well as alcohol and drug use.
 

 [6]
 

 The defense stressed certain eccentricities that occurred during the robberies, such as defendant’s $5 gift to the clerk, his removal of the mask, and his reference to the red pickup. These can be explained readily as either attempts at exoneration or bravado.
 

 [7]
 

 Neither defendant nor Deese was certain that the word “advantageous” was, in fact, used. Defendant, who was 19 at the time of the interrogation, testified that Radley said to him that he was on the borderline between county jail and prison and intimated that if defendant went to prison they would turn him into a woman. Radley denied making either statement.
 

 [8]
 

 Defendant claimed to have drunk a quart of wine and ingested numerous capsules of Demerol around the time of the robberies. As indicated above, other evidence casts doubt on the truthfulness of defendant’s testimony. Moreover, none of the victims or eyewitnesses or either of the police officers involved in the arrest and interrogation of defendant noticed
 
 any
 
 outward signs of intoxication or drug use.
 

 [9]
 

 The
 
 Jimenez
 
 decision was handed down a full six months after the conclusion of defendant’s trial. However, it applies to all cases pending on appeal on June 29,1978.
 

 [10]
 

 “An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.”
 

 [11]
 

 “Except as provided in subdivision (b) and subject to Section 654, when any person is convicted of two or more felonies, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same or by a different court and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all such convictions shall be the sum of the principal term, the subordinate term and any additional term imposed pursuant to Section 667.5. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any enhancements imposed pursuant to Section 12022, 12022.5, 12022.6 or 12022.7. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall exclude any enhancements when the consecutive offense is not listed in subdivision (c) of Section 667.5, but shall include one-third of any enhancement imposed pursuant to Section 12022, 12022.5 or 12022.7 when the consecutive offense is listed in subdivision (c) of Section 667.5. In no case shall the total of subordinate terms for consecutive offenses not listed in subdivision (c) of Section 667.5 exceed five years.”
 

 [12]
 

 “(a) In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including but not limited to any time spent in a jail, camp,
 
 *175
 
 work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, including days served as a condition of probation in compliance with a court order, and including days credited to the period of confinement pursuant to Section 4019, shall be credited upon his term of imprisonment, or credited to any fine which may be imposed, at the rate of not less than thirty dollars ($30) per day, or more, in the discretion of the court imposing the sentence. If the total number of days in custody exceeds the number of days of the term of imprisonment to be imposed, the entire term of imprisonment shall be deemed to have been served. In any case where the court has imposed both a prison or jail term of imprisonment and a fine, any days to be credited to the defendant shall first be applied to the term of imprisonment imposed, and thereafter such remaining days, if any, shall be applied to the fine.”
 

 [13]
 

 As the People point out, the reference in the abstract of judgment to Penal Code section 12022 is a clerical error. The record indicates that the trial court properly chose the greater enhancements on each count and sentenced defendant to the middle term of three years, and an additional two years for the use of a firearm (a total of five years) for each of the robberies that occurred on August 4, 1977 (Atchison, Sulli and Senter, counts II, III and IV, respectively) with the terms to run consecutively. As to the robbery of Bunyard on August 2, 1977 (count I), on which the jury had found that defendant was armed and used a firearm, defendant was sentenced to one-third of the middle term (12 months) and one-third (8 months) of the greater enhancement (24 months), or a total of 20 months in state prison to run consecutive to the term for which defendant was sentenced for the other robberies.