[Crim. No. 18506. First Dist., Div. Two. Nov. 19, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD PALMER LEE NICHOLAS, Defendant and Appellant.

**COUNSEL**

Linda DeBene for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, and Laurence K. Sullivan, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**TAYLOR, P. J.**—Defendant appeals from a judgment entered on jury verdicts finding him guilty of two counts of first degree murder (Pen. Code, §§ 187, 189) and two counts of first degree robbery (Pen. Code, § 211), while armed (Pen. Code, § 12021) and using a firearm (Pen. Code, § 12022.5), and finding him sane as to each count. The major

contentions on appeal are that: 1) his arrest was unlawful; 2) his confession was involuntary as made after threats, promises and psychological inducements and also was a product of continued interrogation; 3) it was error to permit the prosecutor to replay the tape-recorded confession to the jury during his closing argument; 4) there was insufficient substantial evidence to support the convictions without the confession; 5) the verdict did not reflect a unanimous jury under either of two alternative murder conviction theories; and 6) the trial court's failure to instruct the jury in the sanity phase of the trial pursuant to the test of *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], was prejudicial error.

For the reasons set forth below, we have concluded that although defendant's confession was inadmissible, the error was not prejudicial per se under the rare exception of *People* v. *Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555] and *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]; accordingly, we affirm the judgment.

The record reveals the following chronology of pertinent facts: On the evening of Sunday, May 29, 1977, Darby Miller, the night manager, and Donald Doss, a part-time attendant, of Frank's (Belser) Beacon Service Station in Oroville, California, were shot and killed during a robbery. Miller's wife, Katherine, proceeded to the station after her husband failed to arrive home at the usual time (10:15 p.m.) and she received no answer to her telephone call.

Defendant and his common law wife, codefendant, Diana P. Williams, were very good friends of the Millers and they frequently visited each other's homes in 1976-1977. Despite Belser's policy against friends of employees lingering about the station, defendant often visited Miller at 9:30 or 10 p.m. at the station and borrowed money from him; they talked about stealing money from the station in a fake robbery.

Katherine discovered the bodies in a back room of the station and notified the police about 10:45 p.m. About $1,477 in cash and some checks were missing. The hands of both victims were bound by black electrician's tape of a type sold and used at the station. The prints lifted from this tape were later matched to defendant's left palm print.

Each victim had been shot three times in the head and neck; two bullets were removed from each body. Two other bullets were found under

Miller's head and in a cardboard box on the storage room floor. These were .22 caliber long rifle ammunition, similar to five manufacturers' types, including the Federal brand; Belser sold only Remington brand ammunition.

A brown foam-lined uniform jacket, typically kept by employees in the storage room during uniform changes, was between the bodies. Several holes, powder burns and blood appeared on the jacket. At least four holes were made by bullets fired from the inside of the jacket between the shoulder blade area in an outward direction. The firearm was a .22 or .25 caliber with a barrel of two to six inches long fired from within an inch of the material.

Defendant had acquired a cowboy-style .22 single action six shot revolver with a holster from a coworker around Easter. The weapon was inaccurate at long distances and required cocking before each shot. Friends, neighbors, defendant's father and Williams saw such a gun and holster several times at various locations and in defendant's presence up to the week of May 29, 1977. Between 4-5 p.m. on May 29, defendant wrote a check for a box of 500 Federal brand .22 shells for the gun at a Yuba City store where he was accompanied by Williams, his father and stepmother.

On the afternoon of May 29, a woman accompanied by a man bought two fur-lined hooded blue jackets at a surplus store in Oroville. The driver's license number on the check used to pay for the purchase had a one-digit variance with defendant's, apparently the result of an error made by the sales person, Ms. Marshall.

Around May 18-20, defendant and Williams had told a neighbor they were going to Petaluma. They sold Williams' belongings for about $1,000. The week before the crimes, defendant and Williams visited the Millers at the station. Defendant indicated that he had quit his job and that they had sold everything except their 1957 pickup and 125cc Kawasaki motorcycle. They planned to head south together; financing for the trip "was taken care of." As a result of this conversation, the Millers discussed their need for additional vacation time.

Around 5:30 p.m. on the afternoon of May 29, the Belsers arrived at their station. Belser observed that the inside cash register and outside cash box (in the hut adjacent to the island) both contained checks and cash. The currency was supposed to be in the safe or locked in the cash

box under the inside cash register. Belser admonished Miller that he should not accumulate the large bills contrary to the prescribed procedures. Miller asked for additional paid vacation or an advance on his Xmas bonus. Belser refused, but offered him an additional week without pay. The matter was not resolved. Belser left but was concerned that Miller was dissatisfied. Miller seemed disappointed when he told Katherine about this discussion in a telephone call around 5:30 p.m.

Around 8:30 p.m. that night, Mrs. Belser returned to the station to obtain some petty cash to go to the movies. Miller was behind the counter near the cash register, and Doss stood nearby. When Mrs. Belser asked Miller whether he wanted to go to the show, Miller answered negatively and in an unusual curt manner as if he was upset. He then took $10 from the register, made a notation, and then joked with Mrs. Belser and returned to his normal demeanor.

Suddenly, defendant appeared very quickly behind Mrs. Belser and said something to Miller. Mrs. Belser only heard the word "money." Miller answered in a muffled voice and fooled with the key ring on his belt which had the keys to both cash boxes. An unidentified blond man was also present.

Williams testified that on May 29, defendant arrived at home about 9:30 p.m. and announced that he planned to rob the station. She refused and they argued for about 10-15 minutes. He then threatened her with the gun which he placed in his pants. She was scared, but drove the Kawasaki cycle while defendant walked. She parked by the Pepsi machine in the station and waited. Just before defendant returned, she heard two shots inside the station. Subsequently, defendant drove the motorcycle with Williams to the Oroville Dam. He threatened Williams and threw the gun into a gully. They returned home and dropped off a money bag. They drove to the Taco Bell and watched police arrive at the station. When they returned home, they burned the checks and hid the money. She suspected, but did not learn about the homicides until the morning.

On the following morning, May 30, defendant kept a week-old appointment to complete the installation of an engine in his pickup in preparation for his two weeks' vacation. When the mechanic (Mr. Clements) mentioned Miller's death, defendant said nothing and was calm; however, he appeared to be anxious to complete the work so he could leave. Williams appeared around noon and remained. The work

on the pickup continued that evening. Williams stated to Clements that she had been in the station about 9 p.m. on the previous day. Defendant also indicated to Clements that he had been there. The same evening, Williams mentioned to defendant's stepmother that there was a lot of money in a recipe box.

Around noon on May 31, in connection with the purchase of some items, Williams gave a neighbor (Hampton) the carton of Federal brand shells purchased on May 29; 1 of the 10 boxes in the carton was missing 12 or 13 shells. She was reluctant to talk about Miller's death. The work on the pickup, including the installation of some expensive accessories, was completed in the late afternoon of Tuesday, May 31. That same night, defendant and Williams left Oroville with the motorcycle in their pickup. Defendant was in a hurry and would not tell his father where they were going. During the trip, defendant told Williams that he had taken her to the station so that he could implicate her if she revealed his involvement.

On June 4, 1977, Williams sold the Kawasaki motorcycle in Livingston, Montana, to a local resident, Jim Nelson, for $60. Williams introduced Nelson to defendant. Defendant had Williams fill out a bill of sale and threw in the helmet. Defendant also promised that the title would be forwarded. Nelson never received the title.

Defendant and Williams returned to Petaluma in the second week of June after defendant was refused entry into Canada. In that month, defendant became friends with James George Watson through Williams' coemployee and then Watson's girl friend, Cindy Hanson.[1] At this time, defendant and Williams were living in a station wagon in Petaluma. One night that month, Watson and defendant were waiting for Williams and Hanson to get off work. During the two or three hours' conversation, they drank a fifth of Southern Comfort. Defendant asked Watson if he had ever killed anyone. Watson answered negatively and asked defendant the same question. Defendant said he robbed a gas station and killed two attendants with three shots in each victim's head. Defendant said "Dead people tell no stories," and stated that he had obtained $900 to $1,000.

Defendant repeatedly mentioned the matter to Watson on several occasions throughout the summer until the middle of August. Defendant

[1] Ms. Hanson married Watson in January 1978.

subsequently explained to Watson that he had used a .22 caliber single action pistol requiring the hammer to be worked; that he had thrown the pistol away in a lake near some blackberry bushes; that he had muffled the gun with a jacket; and that one of the victims was a friend named Darby.

In late June, Williams indicated to Hanson that she was afraid of defendant. In July, defendant asked Hanson and Watson how they would feel if they knew "that someone had killed someone." On another occasion, defendant told Hanson of having a dream about Darby but then stated that the dream was about his mother.

In the latter part of July, when defendant and Watson were on their way to Oroville, defendant suggested they retrieve the pistol. Watson said to leave it. When they passed by the Beacon station, defendant indicated that it was the place where he "did his thing." That night, defendant smiled at Watson when defendant's father indicated that two persons were being held for the murders and that there was a reward.

The following day in Petaluma, defendant mentioned to Williams and Watson that he had considered retrieving the gun on the previous night. Williams said, "I doubt if you could find it. It was thrown a long way." After Williams intimated that the gun could be traced, defendant replied, "No it can't. It's been passed through six different hands."

In the first week of August, defendant told Watson that he meant "absolutely nothing" to him as a friend and that defendant could kill Watson, Hanson and Williams and "think nothing of it." Defendant also intimated that he would kill Williams if he believed that she "was getting shaky." Watson had seen defendant and Williams both shoot a .22 hammerless revolver, which defendant kept either in his pocket or the glove box of the station wagon. Out of fear, Watson told the story to San Francisco Police Detective Dave Toschi, including defendant's possession of the .22 caliber revolver and habit of carrying a buck knife.[2]

---

[2]The buck knife was found in the possession of defendant's father on September 1, 1977. The operable .22 "hammerless" revolver apparently had a hammer which required cocking before firing; it could not shoot .22 longs with the particular cylinder in place when taken from defendant's station wagon glove box in a consent search following his arrest. Two blue jackets were also in the car.

On August 10, 1977, Department of Justice Special Agent O'Farrell interviewed Hanson and Watson. On August 11, defendant and Williams were arrested at 3:55 p.m. in the parking lot in their Ford station wagon at Williams' place of employment in Petaluma on a complaint and warrant for passing bad checks (Pen. Code, § 476a). Williams was advised that she also was being arrested without a warrant on the homicides; defendant was later advised that he too was being booked on the homicide charges. Probable cause for the warrantless arrests for the homicides was based on the above detailed information supplied by Watson and Hanson.

Williams was admonished and waived her rights on her way to the Petaluma police station. Defendant stated he knew his rights and attempted to recite them from memory. Defendant was interrogated by Department of Justice Agents Rodman and O'Farrell and Sonoma County Sheriff Department Sergeant Carlstedt at the Petaluma police station in a recorded interview, which began at 6:59 p.m. Defendant ultimately confessed, as described in detail below. During a telephone conversation with his stepmother shortly after his arrest, defendant admitted responsibility for the murders. In a jailhouse conversation with his father, defendant admitted killing Miller just "to see what it was like."

At the guilt phase of the trial, defendant relied on a diminished capacity defense and did not testify. At the sanity phase, defendant testified in detail and admitted all of the offenses.

On appeal, defendant first urges that the trial court committed reversible error by ruling his initial postarrest confession voluntary and permitting its admission into evidence. He maintains that this confession was involuntary as it was obtained by the police: 1) as the result of an illegal arrest; 2) through the use of psychological pressure and coercion; and 3) in violation of his *Miranda* rights.

 Initially, we turn to the contentions pertaining to the arrest.

Defendant conceded that he was arrested on a complaint and warrant for passing bad checks at a local store (Pen. Code, § 476a), which was filed, issued and teletyped to the arresting officers on August 10-11, 1977. Since no challenge was made, there is nothing to decide (*People v. Chilton* (1966) 239 Cal.App.2d 329, 331 [48 Cal.Rptr. 212]). With or without probable cause for the murders and robbery, defendant was

lawfully in custody on the warrant charges. There is no indication in the record that the check charge and prosecution thereon constituted an abuse of discretion; the police intentions with respect to that prosecution are irrelevant. Officers are not required to investigate the legality of a facially valid warrant (*Allison* v. *County of Ventura* (1977) 68 Cal.App.3d 689, 697 [137 Cal.Rptr. 542]).

In any event, defendant's contention that there was no probable cause to arrest him on the murder or robbery charges is without merit. ■ Probable cause exists when the facts known to the arresting officer would lead a person of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime (*People* v. *DeVaughn* (1977) 18 Cal.3d 889, 895 [135 Cal.Rptr. 786, 558 P.2d 872]).

■ Defendant bases his contention on the "unreliability" of the "untested informants," Watson and Hanson. Defendant ignores the fact that Watson, a probationer, had voluntarily admitted criminal involvement with defendant by way of concealment. Statements of a probationer admitting crimes are declarations against interest and tend to show reliability (*United States* v. *Harris* (1971) 403 U.S. 573, 583-584 [29 L.Ed.2d 723, 733-734, 91 S.Ct. 2075]; *People* v. *Hall* (1974) 42 Cal.App.3d 817, 823 [117 Cal.Rptr. 228]; *Ming* v. *Superior Court* (1970) 13 Cal.App.3d 206, 214 [91 Cal.Rptr. 477]). The information was entirely consistent with what was then known by the police (*People* v. *Gunnerson* (1977) 74 Cal.App.3d 370, 381 [141 Cal.Rptr. 488]).

■ Defendant's claim that the officers had time to secure a warrant is equally without merit. The police had been informed that defendant and Williams were living in an automobile; the arrest occurred in a parking lot. Therefore, a warrant was not necessary (*United States* v. *Watson* (1976) 423 U.S. 411, 416-424 [46 L.Ed.2d 598, 604-609, 96 S.Ct. 820, 1488]).

As to the confession, we are not confronted with any conflict in the evidence as to the events leading up to the confession or the recordings made. The events that occurred during the 19-minute gap between the recordings were described by the officers present; their testimony is not in conflict. It is our duty to examine these uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147

Cal.Rptr. 172, 580 P.2d 672]; *People* v. *McClary* (1977) 20 Cal.3d 218, 229 [142 Cal.Rptr. 163, 571 P.2d 620]). We note that all of the lower court's ruling on the voluntariness and admissibility of defendant's confession was made prior to *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] (decided May 9, 1978), and *People* v. *Braeseke* (1979) 25 Cal.3d 691 [159 Cal.Rptr. 684, 602 P.2d 384] (originally decided Nov. 15, 1979; vacated May 12, 1980; reinstated *People* v. *Braeseke* (1980) 28 Cal.3d 86, 87 [ 168 Cal.Rptr. 603 , 618 P.2d 149 ](Aug. 28, 1980), judgment stayed Oct. 3, (Oct. 14, 1980) 449 U.S. 895 [ 66 L.Ed.2d 125 , 101 S.Ct. 261])).

The undisputed facts show the following: Defendant was arrested at approximately 4 p.m. on August 11, 1977, in Petaluma, and transported to the Petaluma Police Department, where he was fingerprinted and booked. He was then transferred to Sonoma County jail in Santa Rosa and rebooked at 5:30 that same day. At approximately 7 p.m. that evening, defendant was brought to the office of the homicide detail of the Sonoma County Sheriff's office, where Rodman, O'Farrell and Carlstedt began to interrogate him in a small room with all three officers present most of the time. At the outset, defendant indicated that he was very tired and had not been drinking. Rodman testified that defendant appeared nervous throughout the interrogation. Defendant was readvised of his rights[3] before the questioning commenced. From 7 p.m. to 7:36 p.m., defendant positively denied any involvement in the murders and indicated that he had a legitimate alibi that he did not want to discuss with the officers.[4] His denials are detailed below.[5]

The officers persisted in their interrogation of defendant, although at one point in the process defendant became emotional and was sobbing as O'Farrell wasn't convinced that defendant "wouldn't change his mind," and "make an admission." O'Farrell admitted that he made some snide remarks for the purpose of "breaking defendant's will."

---

[3]After being asked if he understood his Miranda rights, defendant responded: "Well, right now, I haven't did nothing toward. . . ." He was then cut off before finishing his sentence, asked whether he waived his rights, and replied: "Yeah."

[4]After repeated questioning, defendant stated that he was at a wrecking yard trying to find parts for his truck at the time of the murder.

[5]Defendant denied going to the gas station at any time during the night of the murder; he denied being at the station; he denied going to the station; he denied killing the two victims; he denied the killings; he denied committing the crime; he denied ever killing anyone; he stated that he would die swearing that he didn't commit the murders.

After defendant again denied the shootings, the officers confronted him with the fact that his palm print had been matched to the ones on the tape that bound Miller's wrists. When asked how his print got on the tape, defendant replied, "I am not a violent person."

The interrogation continued as follows: "Q. [O'Farrell] Do you think there is anything we could, we could, show you or anything that would refresh your memory which you have blocked out of your head? A. I don't know. Q. When did you block this out of your head? A. I don't remember doing it. Q. Well, you seem to have a pretty good remembering not so long ago when you were talking with some other people. A. I would die, I would die swearing I didn't do it. Q. That's neat—*that may be the case*, I don't know. Q. [Carlstedt] *Death penalty went back in today*. Q. [O'Farrell] *Did you know that*? A. If I'm guilty, which I feel I am not, then a life for a life. Q. [O'Farrell] *You've only got one, there's two dead people, pal. You can't pay it back. That doesn't even make it even*. About the best you can do, you know, if I was sitting in your position, wired up as tight as you're wired up, I think the best I could do is look at myself and say, '*At least I can be a man now*, at least I can tell what the hell did happen.' And what I did then and maybe I'm not the same person now that I was then, but I can lay it out. *I can earn some respect* anyway. But to continue on with a Mickey Mouse lie when your [*sic*] nailed—you know that, just shows *that's going to get you nothing but contempt from anybody. I'd have some consideration for you* if you would sit up and say, Ok, I'm had. A. Would you turn that off?" (Italics added.)

Immediately thereafter, at 7:36 p.m., defendant asked that the tape recorder be turned off. He then asked that Carlstedt and Rodman leave the room so that he could speak with O'Farrell alone. After they left, O'Farrell testified that the following exchange occurred: "A. Mr. Nicholas asked me if the room was bugged. Q. All right. What was your answer? A. And I said, I said no, not to my knowledge. And then he asked me if there was anybody in the office to the rear that adjoins that office. And I said no. Q. Okay. And what was the next question by Mr. Nicholas to you? A. Well he lowered his head and he said 'I did it and I don't know why I did it.'" Defendant then became remorseful, asked for Williams to be present, and agreed to make a tape-recorded statement in front of all of the officers. He then confessed.

The privilege against self-incrimination, which is guaranteed by both the federal and state Constitutions, protects an accused against use

by the prosecution of his confession unless it is shown to be the product of a free will and rational intellect (*People v. Jimenez, supra*, 21 Cal.3d, at p. 605). Confessions obtained by coercive practices which overcome the will of the person confessing are tainted. Both the confession and its products will be suppressed (*People v. Andersen* (1980) 101 Cal.App.3d 563, 574 [161 Cal.Rptr. 707]), as part and parcel of the general rule that "'precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny.'" (*People v. Pettingill, supra*, 21 Cal.3d, at p. 237; *People v. Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].)

The setting of an in-custody interrogation is inherently coercive (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People v. Pettingill, supra*, 21 Cal.3d 231). In *Miranda, supra*, ". . . the court adopted a rule requiring a suspect under interrogation in custody to be advised he need not answer questions; if he does, his answers can be used against him; he is entitled to consult a lawyer; if he cannot afford a lawyer one will be provided at no expense. The court has interpreted custody broadly, to include any situation where a suspect is under interrogation in police surroundings and does not feel free to leave. But the *Miranda* court rejected a rule that would prohibit all questioning of suspects. 'Confessions remain a proper element in law enforcement.' (*Miranda v. Arizona* (1966) *supra*, at p. 478. . . .) (5) Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. As noted by Friedman, J., good faith confrontation is an interrogation technique possessing no apparent constitutional vice. (*People v. Lantz* (1968) 265 Cal.App.2d 5, 8. . . .) Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. It is apparent that when the police interview a suspect, they must skate a fine line. They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been the victims of foul play. They are authorized to interview suspects who have been advised of their rights, but they must conduct the

interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise." (*People* v. *Andersen, supra,* 101 Cal.App.3d, at p. 576.)

Here, the officers continued to interrogate defendant after his repeated denials of guilt and used admittedly psychologically coercive tactics in order to wear down his will. Defendant was admonished to protect his girl friend accomplice, and to "earn some respect" by telling the truth; that if he continued to deny his guilt he would get "nothing but contempt from anybody"; that the interrogators would "have some consideration for [him]" if he admitted his crime; and that he should·"at least ... be a man now."

■ The above described conduct alone cannot be considered unlawful coercion, as advice or exhortation to tell the truth does not, in itself, render a subsequent confession involuntary (*People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Wischemann* (1979) 94 Cal.App.3d 162, 172 [156 Cal.Rptr. 386]). Moreover, "'[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People* v. *Jimenez, supra,* 21 Cal.3d, pp. 611-612.)

However, the officers went further than giving mere exhortation and advice to defendant to tell the truth. As indicated above, Carlstedt, ostensibly speaking to O'Farrell, mentioned that the "[*d*]*eath penalty went back in today.*" O'Farrell, turning to defendant, asked, "Did you know that?" Defendant answered: "If I am guilty, *which I feel I am not*, then a life for a life." (Italics added.)

At the preliminary examination, O'Farrell admitted that the above reference was not a "very sharp interrogative technique" and that it was error to "inform a suspect to tell the truth...because [he] can get the death penalty...." Carlstedt testified that although the officers knew that the reenactment of the death penalty would have no retroactive effect on defendant's case,[6] no one bothered to explain this fact to defendant.

---

[6]Defendant's interrogation occurred on August 10, 1977. At this time, the United States Supreme Court had struck down mandatory death penalty statutes in *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]. Our California Supreme Court followed suit in *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101], applying the new federal standards, and conclud-

In this state, before a confession can be used against a defendant, the prosecution has the burden of proving that it was voluntary and was not the result of any form of compulsion. The "only issue is whether...[the defendant's] abilit[y] to reason or comprehend a result were in fact so disabled that he was incapable of free or rational choice." (*In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633], citing *Townsend* v. *Sain* (1963) 372 U.S. 293, 308-309 [9 L.Ed.2d 770, 782-783, 83 S.Ct. 745].) The circumstances must be such as to overbear a rational intellect and free will (*People* v. *Wright* (1976) 60 Cal.App.3d 6, 15 [131 Cal.Rptr. 311]). Inducements or threats must be the motivating cause of a confession before it is held involuntary (*People* v. *Wischemann, supra*, 94 Cal.App.3d 162). The slightest pressure, however, whether by way of inducement to confess, or threat if confession is withheld, is sufficient to require the exclusion of the confession (*People* v. *Jimenez, supra*, 21 Cal.3d, at p. 606; *People* v. *Berve* (1958) 51 Cal.2d 286 [332 P.2d 97]).

Applying the foregoing rules to the facts in this case, the totality of the circumstances surrounding defendant's interrogation reveals unquestioned abuse. Although there were no express threats in the death penalty reference, in the context of the in-custody interrogation, after repeated denials of guilt by defendant and coupled with the other psychologically coercive ploys of the police, *such a threat was implied.* What other conceivable reason would the officer have in mentioning the death penalty? Such an implication was palpably false and deceitful. The officer admitted at the preliminary examination that he knew the death penalty was not applicable to the defendant's case. The matter was further exacerbated by defendant's clear acceptance of the death penalty as a possibility when he said "If I'm guilty...then a life for a life." At this point, the officers, rather than correcting defendant's expressed misconception, perpetuated their deception by telling him there were two people dead and he could not equalize the situation. In the very next series of comments, the officers, in effect, told defendant they would have consideration for him if he would admit the crimes. Whereupon, defendant then expressed his desire to speak to one of the officers alone and without recordation.

---

ing that the then death penalty statutes (Pen. Code, §§ 190-190.3) were unconstitutional. The Legislature amended these statutes and others on August 11, 1977 (Stats. 1977, ch. 316, §§ 4-14) to conform to the prescription announced in *Rockwell*. Subsequently, the 1977 statutes were changed by initiative measure on November 7, 1978.

Further, the record also indicates that defendant's confession to all charges was obtained in violation of his rights as announced in *Miranda v. Arizona, supra,* 384 U.S. 436, which he invoked during the interrogation.[7] In *Miranda,* the court established certain procedural safeguards designed to protect the rights of an accused, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation. The court specified, among other things, that if the accused indicates in any manner that he wishes to remain silent or to consult an attorney, interrogation must cease, and any statement obtained from him during interrogation thereafter may not be admitted against him at his trial.

*Miranda* is not satisfied by a mechanical recitation of its four well-known required warnings, even if this recitation precedes each of several interrogations of a suspect held in police custody (*People* v. *Randall* (1970) 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114]). "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Miranda, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at p. 723].)

The duty to cease interrogating commences only upon the suspect's initial indication that he wishes to exercise his Fifth Amendment privilege. If the suspect is willing to discuss the case *fully* with the police officers after having been taken into custody and advised of his rights, *Miranda* imposes no constitutional inhibition to continued questioning (*People* v. *Randall, supra,* 1 Cal.3d, at p. 955; *People* v.

---

[7]The People argue that this issue is not properly before us, as no specific *Miranda* objection was made below. However, as indicated above, *Pettingill, supra,* 21 Cal.3d 231, and *Braeseke, supra,* 25 Cal.3d 691, were decided after the trial of the instant matter and based on constitutional grounds. We assume that the rules of these cases are to be applied retroactively to cases whose judgments have not become final (cf. *People* v. *Brigham* (1979) 25 Cal.3d 283, fn. 15, at p. 292) [157 Cal.Rptr. 905, 599 P.2d 100]). *Braeseke, supra,* must be followed by us pending any further action by the United States Supreme Court (cf. *People* v. *Krivda* (1971) 5 Cal.3d 357 [96 Cal.Rptr. 62, 486 P.2d 1262]).

*Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Turnage* (1975) 45 Cal.App.3d 201, 209-210 [119 Cal.Rptr. 237]). However, a suspect may indicate that he wishes to invoke the privilege by means other than an express statement to that effect; no particular form of words or conduct is necessary (*People* v. *Randall, supra*). A suspect may indicate such a wish in many ways.

■ Here, defendant's requests to turn off the tape recorder and to speak with O'Farrell alone, together with his request for assurances of complete privacy, constituted an invocation of his privilege (*People* v. *Braeseke, supra*, 25 Cal.3d 691). As our Supreme Court indicated in *Braeseke*, at page 702: "A request to speak 'off the record' cannot constitute a knowing and intelligent waiver of rights which include the advisement that 'anything [a suspect] says can be used against him in a court of law.'" Given lack of a knowing and intelligent waiver by defendant of his *Miranda* rights, the instant situation is similar to *Braeseke* and *Pettingill, supra*, 21 Cal.3d 231, and compels the conclusion that defendant's confession was improperly admitted.

Under *Miranda* and its California progeny (*People* v. *Fioritto, supra*, 68 Cal.2d 714; *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Randall, supra*, 1 Cal.3d 948; *People* v. *Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Carr* (1972) 8 Cal.3d 287 [104 Cal.Rptr. 705, 502 P.2d 513]; *People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406 [118 Cal.Rptr. 617, 530 P.2d 585]; *People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Enriquez* (1977) 19 Cal.3d 221 [137 Cal.Rptr. 171, 561 P.2d 261]; *People* v. *McClary, supra*, 20 Cal.3d 218; *People* v. *Pettingill, supra*. 21 Cal.3d 231; *People* v. *Braeseke, supra*, 25 Cal.3d 691), the normal rule is that the improper admission of a confession constitutes reversible error per se (see *People* v. *McClary, supra*, 20 Cal.3d 218, 230; *People* v. *Schader* (1965) 62 Cal.2d 716, 728-729 [44 Cal.Rptr. 193, 401 P.2d 665]).

In *People* v. *Schader, supra*, 62 Cal.2d, at pages 729-730, our Supreme Court discussed the rationale for the per se rule. In *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001], the court stated that "'a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citations.] These consider-

ations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result.'" The Supreme Court in *Schader, supra*, noting this rationale for the per se rule, stated: "In determining the prejudicial effect of the illegally obtained confession at trial we are not concerned with the nature of the error that caused the illegality. The *reason* that the confession should not have been introduced into evidence is no longer material. As to its impact upon the jury and the prejudicial effect, the confession obtained in violation of defendant's right to counsel cannot be distinguished from the confession obtained in violation of defendant's right to be free of coercion.

"In this inquiry we cannot logically distinguish between the different bases for the exclusion of the confession.... After holding that the confession should not have been admitted, we can only be concerned with the effect of the confession upon the jury's deliberation, regardless of the type of error involved. It is because of the effect of the confession that the reversal is compelled." (*Schader, supra*, at pp. 729-730.)[8]

The only exception to the per se rule is predicated on the rationale enunciated in *People v. Jacobson, supra*, 63 Cal.2d 319. This exception was not raised by either side but revealed by our research. In *Jacobson*, the defendant made approximately 10 separate admissions or confessions, of which the last 2, made at the police station during and after booking, were objectionable because of the absence of *Miranda* warnings. Noting that no undue emphasis was placed on any of the confessions at defendant's trial, that each person who had witnessed defendant make an incriminating statement testified as to what he had heard, that no one confession contained details significantly different from the others, and that the sequence of confessions precluded the possibility that the legally obtained confessions were "induced" by those subsequently improperly obtained, the court concluded that *Jacobson's* was a "rare case" in which it could be said that there was no reasonable possibility that the evidence complained of might have contributed to the convic-

---

[8]The same rationale for its rule had been set forth by the United States Supreme Court. If "a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment." (*Payne v. Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844].)

tion (pp. 330-331). This exception was also applied in *People* v. *Cotter, supra*, 63 Cal.2d 386, in which the defendant gave seven statements, four of which were admissible, and three of which were not.

We think that the following evidence brings the instant case within the same "rare" exception to the per se rule. Here, long before his arrest, defendant made a series of statements to the witness Watson that constituted a detailed confession of defendant's intentional participation in the Beacon Service Station robbery and murders. Prior to the arrest, defendant also made incriminating admissions to Watson's girl friend, who so testified. Defendant's statements to the witness Williams immediately after the crimes were tantamount to a confession. The time sequence of these precludes any possibility that they were induced by the improperly obtained subsequent confession.

Williams testified at the trial that she was with the defendant when he acquired the bullets and the gun, that she went with him to the location, that he had announced he was going to rob the Beacon station, that she heard the shots, that she drove the getaway car, that she was with him when he disposed of the gun, the loot and the safe keys, and that he threatened to kill her if she told.

After his arrest, on two separate occasions, defendant admitted the homicides. Defendant told his father he had killed Darby; that he did not do it for the money but just "to see what it was like." Defendant also told his stepmother that he had murdered Miller and Darby. Both the father and stepmother so testified. While these statements were made after defendant's confession to the officers, there is no indication that they were induced thereby. It cannot be argued that defendant could have believed that he was helping his defense by confessing the crimes to his parents. Further, we also note that the only defense presented was diminished capacity. Thus, we do not believe that defendant's failure to take the stand at the guilt phase of his trial was motivated by or in any way related to the admission of the illegally obtained confession.[9]

As all of the above evidence was admitted at the trial prior to any mention of defendant's illegally obtained confession or the circumstances surrounding the same, it seems clear that the confession's

[9]Our view is confirmed by the fact that as stated above at page 260, at the sanity phase of the trial, defendant freely admitted all of the charged offenses.

impact on the jury was inconsequential and could not, and did not, affect the ultimate outcome of the trial.

In addition to the numerous statements and confessions other than the one in question, we attach great significance to the totality of the evidence, which includes physical and circumstantial evidence of overwhelming weight. In this regard, the instant case appears much stronger than either *Jacobson* or *Cotter, supra.* Williams' testimony and the circumstances of the crime were corroborated by: 1) the execution-style deaths of the victims; 2) defendant's planning activity in buying guns, ammunition and clothes; 3) the disappearance of the money and Williams' statement to defendant's stepmother that there was a lot of money in a box on the day after the shooting; 4) the flight of defendant and the subsequent sale of the motorcycle and helmet; 5) Miller's nervousness on the eve of the robbery and defendant's appearance at the station where he apparently borrowed some money; and 6) *most compelling, defendant's palm prints lifted from the tapes which actually bound the victims.*

As indicated above, the rationale for the application of the per se rule to a confession is that of a confession's overriding persuasiveness to a jury. This apparently is the reason for distinguishing the admissibility of evidence obtained in violation of the Fifth Amendment from evidence obtained in violation of the Fourth Amendment. Since the rationale of the per se rule is that a confession is so persuasive as to almost dictate a verdict of guilt, then here, as in *Jacobson* and *Cotter, supra*, there is a good argument for applying the exception. We refer to the standard laid down by Justice Mosk in *Jacobson, supra*, 63 Cal.2d at page 331, and conclude that the overwhelming circumstantial evidence and the many properly admitted confessions and incriminating statements *"unequivocally"* precluded any possibility that the admission of the one illegally obtained confession could have been a significant factor in the resultant verdict of guilty.

The district attorney is subject to criticism for introducing and commenting on the objectionable confession, particularly when the evidence was otherwise so compelling. This is a clear case of overkill and unnecessary risk. Nevertheless, it should be obvious to anyone that if we apply the per se rule and send the case back for retrial, the result must be the same. To do so would result in a needless expenditure of public funds and erode confidence in our judicial system.

In addition, the offenses occurred in May 1977; the trial in March 1978. Any retrial could not commence until about three years after the first trial and four years after the offenses. Given the time lapse, many of the key witnesses may no longer be available, able or willing to testify. At best, their recollection of events is likely to be further dimmed by the passage of time. Similarly, the physical evidence may no longer be available or in the same condition. Because of the seriousness of the offenses, we must not, in the light of defendant's unquestioned guilt, exalt form over substance in this rare case. We should not cavalierly gamble with the lives of others by taking a chance that a multiple murderer as dangerous as defendant could be turned loose on society.

We hold that we have here one of those "rare cases" where the evidence, other than the coerced confession, is so compelling that, even though the prosecution emphasized the coerced confession by replaying it on argument, it cannot be said that it made any difference in what had to be a verdict of conviction in any event (*People v. Jacobson, supra,* 63 Cal.2d 319; *People v. Cotter, supra,* 63 Cal.2d 386). Furthermore, contrary to defendant's argument the testimony of Watson and Williams and the physical evidence provided abundant proof of defendant's specific intent to commit the robbery and murders.

█ Defendant next asserts that the verdict was not unanimous as to either of the two theories[10] on which he was found guilty. He argues, therefore, that some of the jurors convicted him on the basis of a "willful, deliberate and premeditated" murder, while others convicted him under the felony-murder rule.

Defendant is entitled to a unanimous verdict from the jury (Cal. Const., art. I, § 16; *People v. Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742], cert. den. 429 U.S. 1077 [50 L.Ed.2d 796, 97 S.Ct. 820]). Here, there was the requisite unanimity that defendant was guilty of *murder.* Penal Code section 187, subdivision (a) defines "murder" as "the unlawful killing of a human being ... with malice aforethought." Penal Code section 189 categorizes those killings which constitute murder in the first degree. "All murder which is perpe-

---

[10]The record indicates that the information alleged two alternative theories of first degree murder as to each victim: 1) willfully, deliberately and with premeditation; and 2) that the murders were committed "during the commission and attempted commission of a robbery...." The prosecution carried both theories through and argued both to the jury in closing argument. The jury rendered its verdict which found the defendant guilty of first degree murder.

trated by means of . . . any . . . kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate . . . [a listed felony, i.e., the felony-murder rule] is murder of the first degree."

On the record, it is impossible to ascertain under which theory the jury reached their unanimous verdict. Defendant's contention on unanimity, however, is contrary to the rule that the jury need not agree on the specific theory by which a unanimous verdict is reached (*People* v. *Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Nye* (1965) 63 Cal.2d 166, 173 [45 Cal.Rptr. 328, 403 P.2d 736]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 670-672 [234 P.2d 632]; *People* v. *Bennett* (1976) 60 Cal.App.3d 112 [131 Cal.Rptr. 305]; *People* v. *Heideman* (1976) 58 Cal.App.3d 321 [130 Cal.Rptr. 349]; see also *People* v. *Hardenbrook* (1957) 48 Cal.2d 345, 353-354 [309 P.2d 424]). Defendant's argument is predicated on an inept analogy to cases which turn on the prosecutorial election as to which of several proven acts occurring during the period charged form the basis upon which a unanimous verdict may be found (*People* v. *Creighton* (1976) 57 Cal. App.3d 314 [129 Cal.Rptr. 249]; *People* v. *Gavin* (1971) 21 Cal.App. 3d 408 [98 Cal.Rptr. 518]; see also *People* v. *Failla* (1966) 64 Cal.2d 560, 567-568 [51 Cal.Rptr. 103, 414 P.2d 39]). Prosecution under a statute requiring a single act (murder) prosecuted under different theories ("willful, deliberate, premeditated" murder v. "felony-murder") does not fit defendant's analogy.

Our Supreme Court specifically rejected defendant's argument in *Milan, supra,* 9 Cal.3d 185. *Milan* held that a defendant may be convicted of murder in the first degree without unanimity of agreement on one of several theories advanced by the prosecution; thus, some jurors may find that the murder occurred during the course of a felony; others, that it was deliberate and premeditated. It is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of first degree murder as that offense is defined by statute (*Milan, supra,* at p. 195).

 Finally, we turn to defendant's contention that the trial court erred to his prejudice in the sanity phase of the trial, as the jury was instructed on the then applicable M'Naghten test of insanity.[11] 

[11]The record indicates that during the sanity phase of the instant bifurcated trial, the court instructed the jury pursuant to CALJIC No. 4.00: "The Defense of Insanity," which is based on the legal rule of insanity as derived from *M'Naghten's Case* (1843)

Subsequently, our Supreme Court adopted the American Law Institute test, set forth below[12] (*People v. Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318]); *Drew* applies retroactively to cases not yet final (p. 348), such as the instant one.

However, the failure to apply the ALI tests pursuant to *Drew* is not reversible error per se. We must determine whether the trial court's failure to so instruct was prejudicial, namely, whether it is reasonably probable that the jury would have found defendant insane if the error had not been committed (*Drew, supra,* p. 352; *In re Ramon M.* (1978) 22 Cal.3d 419, 431 [149 Cal.Rptr. 387, 584 P.2d 524]; *People v. Wischemann, supra,* 94 Cal.App.3d 162, 168-171; *People v. Phillips* (1979) 90 Cal.App.3d 356, 365-366 [153 Cal.Rptr. 359]; *People v. Stewart* (1979) 89 Cal.App.3d 992, 1000 [153 Cal.Rptr. 242]; *People v. Wagoner* (1979) 89 Cal.App.3d 605, 613 [152 Cal.Rptr. 639]; *People v. Sargent* (1978) 86 Cal.App.3d 148, 153 [150 Cal.Rptr. 113]).

Therefore, we have examined the record to determine if there is a reasonable probability that a properly instructed jury, with court and counsel guided by the ALI test, would have found defendant not guilty by reason of insanity. Defendant points to numerous portions of the testimony adduced during the sanity phase. He asserts that reasonably, he could have been found insane under at least one, if not both, prongs of the ALI standard.[13] The jury in the instant case found defendant sane under the M'Naghten test (cognitive prong). Thus, we are concerned with whether or not it is reasonably probable that the jury would have found defendant insane based on the second or volitional prong of the ALI test.

---

10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722] and adopted by California in *People v. Coffman* (1864) 24 Cal. 230, 235.

The *M'Naghten rule* defines insanity as a diseased or deranged condition of the mind which makes a person incapable of knowing or understanding the nature and quality of his act or makes a person incapable of knowing or understanding that his act was wrong (see *People v. Wetmore* (1978) 22 Cal.3d 318, 323, fn. 3 [149 Cal.Rptr. 265, 583 P.2d 1308]).

[12]"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law" (Model Pen. Code (Proposed Official Draft) (1962) § 4.01, subd. (1)).

[13]There are two prongs to the ALI test for insanity: cognitive and volitional (*People v. Phillips, supra,* 90 Cal.App.3d 356; *People v. Wischemann, supra,* 94 Cal.App.3d 162; *People v. Stewart, supra,* 89 Cal.App.3d 992). *Drew, supra,* expanded the old California (M'Naghten) test which had focused on the first or cognitive prong to in-

Defendant's argument focuses on the testimony of his expert, Dr. Weissman, who stated that on the basis of his observations and a clinical interview, he considered defendant a paranoid schizophrenic whose emotions could come out in impulsive, destructive, hostile acts. Weissman opined that there was a "serious question ... as to whether the instant offense was committed during a delusional episode," which could affect defendant's "capability of conforming to the duty under the law." Weissman also noted defendant's history of distorting reality, absence of interpersonal relationships, erratic and cruel behavior to animals and people, feeling of persecution, grandiose delusions, hostility and experience with hallucinations.

The court-appointed experts, Drs. Gerald McGuire and Ernest Ely, evaluated the police reports, two MMPI tests conducted on October 18 and 27, 1977, and also interviewed defendant. Both considered the tests invalid due to gross exaggeration of pathological tendencies and considered it medically improper to draw any conclusions without subsequent reinterviews. They opined that defendant revealed no delusional thinking process, mental, neurological, amnesiatic, erratic thinking or substantial mood disorder. Defendant understood the nature of his act, the consequences and that what he was doing was wrong. Defendant was sane, manipulative, evidenced a characterological/sciopathic nature, did not suffer from paranoid schizophrenia and could form specific intent.

During surrebuttal, Weissman opined that his tests were valid and that the results showed defendant to have an "antisocial personality overlying a paranoid schizophrenic psychotic core."

As noted in *People* v. *Wetmore, supra*, 22 Cal.3d at pages 330-331, the defense of diminished capacity[14] is very close to that of in-

---

clude those who may have an intellectual capacity to understand right from wrong and yet are unable to so conform their behavior. The prongs of the test are in the alternative: the accused can be found insane either due to lack of cognitive capacity or due to lack of volitional capacity to commit the charged crimes.

[14]Defined as "[W]hether he was compelled to do this because of some mental condition,...." (*People* v. *Gorshen* (1959) 51 Cal.2d 716, 725 [336 P.2d 492]). "Competent testimony to the effect the act of killing resulted from an irresistible impulse due to mental disease is relevant evidence hearing on the issues of intent to kill and malice aforethought." (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 686 [105 Cal.Rptr. 792, 504 P.2d 1256].) "[T]he true test [of premeditation and deliberation] must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act." (*People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959].) "If because of mental

sanity as defined by the ALI test, although the tactics and results of successful use of the two defenses are different (*Wetmore, supra*, pp. 328-330; see Comment, *People* v. *Drew: California Adopts the ALI Insanity Test* (1979) 67 Cal.L.Rev. 706, 721, fn. 71). Thus, our Supreme Court has urged the Legislature to reconsider the statutes providing for a bifurcated trial.

In *People* v. *Cruz* (1980) 26 Cal.3d 233 [162 Cal.Rptr. 1, 605 P.2d 830], the court recently considered the duplication of effort when the defendant raises the diminished capacity defense and also pleads insanity (see also *Wetmore, supra*, 22 Cal.3d, at p. 331). *Cruz, supra*, held that it was not reasonably probable that the jury, which had rejected Cruz' defense of diminished capacity and which had convicted him of first degree murder, would have found him insane if the case had been tried using the ALI test (at p. 252).

Similarly here, defendant raised the issue of diminished capacity in the guilt phase as to his inability to form the requisite specific intents of the offenses. All of the psychiatrists testified during the guilt phase. The jury was instructed as to the question of diminished capacity. Thus, here, as in *Cruz, supra*, the record indicates that the jury completely rejected defendant's defense of diminished capacity by returning a verdict of first degree murder. In so doing, the jury necessarily rejected the evidence that might support a verdict that defendant was legally insane at the time of the offenses under the ALI test. We conclude, therefore, that there was no miscarriage of justice (Cal. Const., art. VI, § 13), and that it is not reasonably probable that the jury would have found defendant sane if they had been instructed pursuant to *Drew*.

The judgment is affirmed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied December 19, 1980.

---

defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought...." (*People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].)