Filed 06/29/16  P. v. Vercher CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C074122 |
| v. | (Super. Ct. No. 12F2083) |
| IVAN ROOSEVELT VERCHER, | |
| Defendant and Appellant. | |

A jury convicted defendant Ivan Roosevelt Vercher of three counts of second degree robbery and one count of second degree commercial burglary.  The jury also found true allegations that a principal was armed with a firearm as to all counts.  In a bifurcated court trial, the trial judge found true the allegations that defendant suffered

1

10 prior serious or violent felony convictions, that defendant was previously convicted in two cases of serious felonies, and that defendant was previously convicted of robbery, served a prison term for that offense, did not remain free of prison custody, and committed an offense resulting in a felony conviction during a period of five years after the conclusion of that prison term.

Defendant now contends (1) he was denied his constitutional right to testify because he told his trial counsel he wanted to testify but his trial counsel did not call him as a witness, (2) the trial court erred in admitting uncharged conduct evidence for the purpose of explaining why defendant was under surveillance, (3) the trial court erred in excluding impeachment evidence relating to Officer Chris Jacoby, (4) the trial court erred in refusing to dismiss his prior strike convictions, and (5) he should have received an additional 101 days of presentence credit.

We conclude (1) defendant failed to timely assert his constitutional right to testify in his own defense, (2) the trial court erred in admitting uncharged conduct evidence for the purpose of explaining why the police had defendant under surveillance, but the error is harmless, (3) defendant fails to show the trial court erred in excluding evidence of alleged misconduct by Officer Jacoby, (4) the trial court did not abuse its discretion in declining to dismiss defendant's prior strike convictions, and (5) we will remand this matter so the trial court can determine the actual days defendant spent in custody and award any presentence credit to which defendant is entitled, because the record does not show how many days defendant was actually in custody following his arrest.

We will affirm the judgment in all other respects.

## BACKGROUND

Law enforcement authorities were investigating a series of robberies from medical marijuana collectives in Redding in the summer of 2011. On August 12, two young men, wearing masks and gloves and carrying guns, entered Northern Patients Group, took marijuana and cash, and hit an employee with a gun. The robbers fled toward a

2

convenience store. Surveillance video from the convenience store showed a white vehicle, like defendant's white Range Rover with custom wheels, at the convenience store near the time the Northern Patients Group robbery was reported to authorities. Northern Patients Group had been robbed a few weeks prior and an employee of another medical marijuana collective reported seeing a man she later identified as defendant slowly driving a white sports utility vehicle past her collective on September 14.

Police identified defendant as a person of interest. Members of the Shasta Interagency Narcotics Task Force conducted surveillance of defendant and his white Range Rover on September 15.

Defendant lived in Redding with his girlfriend Janel and her 16-year-old son C. Janel owned a Dodge Charger.

Cell phone records show defendant's cell phone sent C.'s cell phone a text message reading, "Hit me when you ready." C.'s cell phone replied, "Yep."

Police saw defendant leave his apartment in the Charger. Officer Chris Jacoby, a member of the surveillance team, testified defendant appeared to talk on a cell phone while he was at a bank parking lot. Cell phone records show defendant's cell phone received a call from the cell phone of Josh Wright, a friend of C.'s, lasting seven seconds. Defendant's cell phone sent Josh's cell phone a text message reading, "I'm here." Defendant's cell phone sent the same message to C.'s cell phone.

Officer Jacoby did not observe defendant continuously while he was in the bank parking lot. However, Officer Jacoby said he saw defendant get out of the car and looked in a southeasterly direction while on the cell phone. Officer Jacoby said a person standing in the bank parking lot where defendant stood could see the front door of the Trusted Friends medical marijuana collective.

Surveillance video from Trusted Friends showed two men entered the collective at 6:43 p.m. Brittany Whitmore, Rikki Apple, and Jade Brewer were getting ready to close the collective for the day when the two men entered. The two men who entered the

3

collective were Josh and E., another friend of C.'s.[1] Josh held a cell phone to his ear during the robbery.

E. pointed a gun at Whitmore, Apple, and Brewer. Whitmore, Apple, and Brewer put cash and about 15 jars containing marijuana worth at least $10,000 into a duffel bag upon E.'s command. E. or Josh asked Whitmore, Apple, and Brewer if there was a safe. Apple and Brewer replied in the negative.

Surveillance video showed the robbers leave Trusted Friends. Whitmore called 911 after E. exited the back door.

Officer Jacoby saw defendant leave the bank parking lot. About 30 seconds after defendant left the bank parking lot, Officer Jacoby heard an advisement about the Trusted Friends robbery. Law enforcement officials stopped the Charger and placed defendant under arrest. Defendant's cell phone received multiple calls from C. and Josh after defendant was apprehended.

E. testified for the prosecution at defendant's trial. Among other things, he said he did not know who came up with the idea of committing the robbery, but he went along with the idea. C. and Josh did not say someone was watching the front of Trusted Friends. E. did not see defendant that day. He never spoke to defendant about committing a robbery. No one told E. defendant was involved in the robbery. But E. saw Josh speaking on a cell phone. He heard Josh say, "we're here." E. waited for Josh to give him the "go-ahead."

---

[1] E. pleaded guilty to one count of second degree robbery and admitted personal use of a firearm during the commission of the robbery, pursuant to a plea agreement under which he received probation. E. was 16 years old at the time of the robbery. Josh pleaded no contest to and was convicted of second degree robbery. He also pleaded guilty to the August 23 second degree commercial burglary of another marijuana collective in Redding.

E. previously told police Josh was talking to someone on a cell phone when Josh and E. were behind a dumpster, and E. heard Josh say, "is it clear? Are we, are we good to go?" to "somebody[,] like the person was sittin' there watching us." But when defendant called him as a witness at the trial, E. testified he could not recall what, if anything, Josh said on his cell phone. E. testified that if he told police he heard Josh say something in particular on his cell phone, it was probably a lie.

Police interviewed C. on September 16 and 19. Recordings of C.'s statements to police were played at the trial. C. told police, during his second interview, that defendant asked C. to pick up a car for Josh to use for a robbery, and defendant expected to receive a "cut" from the robbery.

C. also gave police information linking defendant to the Northern Patients Group robbery. C. said Josh admitted committing the Northern Patients Group robbery with an individual named Deedee. According to C., Josh said defendant gave Josh the layout of Northern Patients Group, and defendant waited by a gas station and picked up Josh and Deedee. C. saw defendant with three or four pounds of marijuana in a duffel bag. Defendant told C. the marijuana was from Josh and defendant was going to sell the marijuana. Josh confirmed to C. that he gave defendant marijuana as defendant's "cut." But C. recanted at the trial.

Police interviewed defendant on September 15 and 16. Recordings of those interviews were played at the trial. Defendant admitted he knew Josh was "doing a robbery" but defendant claimed he did not know where the robbery was going to take place. Defendant said Josh asked defendant to pick up Josh at the Redding Inn, and defendant stopped at the bank parking lot to urinate. Defendant admitted he was talking on the cell phone with Josh during the robbery, but insisted he did not know Josh was committing a robbery during the call. Defendant denied he was involved in the marijuana collective robberies.

5

The jury found defendant guilty of three counts of second degree robbery (Pen. Code, § 211)[2] and one count of second degree commercial burglary (§ 459). The jury found the allegation that a principal was armed with a firearm (§ 12022, subd. (a)(1)) to be true as to all counts. In a bifurcated court trial, the trial judge found true the allegations that defendant had 10 prior strike convictions (§ 1170.12), was previously convicted of a serious felony in two cases (§ 667, subd. (a)(1)), and was previously convicted of robbery (§ 211), served a prison term for that offense, did not remain free of prison custody and committed an offense resulting in a felony conviction during a period of five years subsequent to the conclusion of that prison term (§ 667.5, subd. (b)).

The trial court sentenced defendant to a determinate prison term of 14 years and an indeterminate prison term of 75 years to life.

## DISCUSSION

### I

Defendant argues he was denied his constitutional right to testify because he told his trial counsel Michael C. Borges, during the People's case-in-chief, that he wanted to testify but Borges failed to inform the trial court of his wish and to call him as a witness.

A criminal defendant has a constitutional right to testify in his own defense. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51-53 [97 L.Ed.2d 37, 46-47].) A defendant who wants to testify may even do so over the objection of his attorney. (*People v. Robles* (1970) 2 Cal.3d 205, 214-215.) However, a defendant must timely and adequately assert his right to testify. (*People v. Guillen* (1974) 37 Cal.App.3d 976, 984 (*Guillen*).) When a defendant does not timely and adequately assert his right to testify, " 'a trial judge may safely assume that a defendant who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his

---

[2] Undesignated statutory references are to the Penal Code.

6

counsel's trial strategy.' " (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231 (*Hayes*); see *People v. Bradford* (1997) 14 Cal.4th 1005, 1053.)

Defendant had numerous opportunities to inform the trial judge he wanted to testify before the jury returned its verdict, and defendant failed to do so. After defendant started presenting evidence in his case-in-chief, the trial judge spoke with defendant, outside the presence of the jury, about testifying. The trial judge told defendant, "I want you to discuss this with your attorney as you see fit. You have an absolute right to testify in your own defense, even if your attorney advises you not to. And if you want to testify, nobody can stop you. [¶] But if you do decide to testify, understand that the Prosecution can thoroughly cross-examine you on every issue and piece of information on which you do testify. [¶] You also have an absolute right to remain silent under the Fifth Amendment. It is your privilege against self-incrimination. And if you do decide you want to remain silent, nobody -- not me, not law enforcement, not the DA, not your lawyer -- can make you testify. It is going to purely voluntary [*sic*] of your own choice. [¶] You should listen to your lawyer's advice about this issue. That's one of the reasons you have him. But the ultimate decision is yours. [¶] Do you understand that?" Defendant replied in the affirmative. The trial judge continued, "if you decide not to testify and you and your lawyer want me to, I will tell the jurors that they cannot consider your silence as evidence against you. Understood?" Defendant again replied in the affirmative. The prosecution had already played recordings of defendant's police interviews at that point in the trial.[3] Defendant did not tell the trial judge he wanted to testify.

---

[3] As defendant acknowledges on appeal, the prosecutor played recordings of defendant's statements to police during the People's case-in-chief and before defendant presented his case. Defendant and Borges incorrectly recalled, in the trial court, that the prosecutor played the recordings during the People's rebuttal.

Thereafter, in the context of discussing which of defendant's prior crimes would be admitted for purposes of impeachment should defendant testify, the trial judge said, outside the presence of the jury, he had already discussed defendant's right to testify with defendant. The trial judge asked whether defendant felt he had learned enough from the judge about the issue, and defendant replied "yes." Defendant did not say he wanted to testify. He rested his case later that afternoon without any indication in the record that he wanted to take the stand.

Also prior to the receipt of the verdict, defendant was present at the jury instruction conference when the trial court discussed giving the CALCRIM No. 355 instruction relating to a defendant's right not to testify. The CALCRIM No. 355 instruction states a defendant has an absolute right not to testify and the jury must not consider, for any reason, the fact that the defendant did not testify. Borges agreed the trial court should give the CALCRIM No. 355 instruction. Again, defendant did not say he wanted to testify.

Defendant or his trial counsel raised the issue of defendant's desire to testify for the first time about four and a half months after the jury returned its verdict. Defendant raised an ineffective assistance of counsel claim after the jury returned its verdict and the enhancement allegations against defendant were found to be true. Defendant asserted that, when the prosecutor played a recording of defendant's police interview at the trial, defendant told Borges he "wanted to testify for sure," but Borges failed to call defendant to the stand. Borges told the trial court, during an in camera hearing, that defendant mentioned a "newly discovered desire to testify" when the prosecution played a recording of defendant's police interview to the jury. However, Borges said he did not specifically recall that defendant wanted to testify, although it was possible he missed defendant's request and closed the evidence too quickly. The trial court relieved Borges and appointed defendant new trial counsel without making a finding that Borges had rendered ineffective assistance of counsel. Defendant subsequently moved for a new trial on the

8

ground that he was denied his constitutional right to testify. Defendant called Borges as a witness in connection with his new trial motion. Borges testified that defendant said, " 'I think I might want to testify' " or " 'I think I want to testify' " when the prosecution was playing a recording to the jury. According to Borges, defendant did not affirmatively state he wanted to testify. Defendant also testified in support of his new trial motion. He maintained he told Borges he wanted to testify.

The trial court had an opportunity to observe Borges and defendant and credited Borges's testimony. The trial court found defendant made an equivocal statement to Borges that he may want to testify. The trial court found defendant did not apprise the trial judge that he wanted to testify before the jury rendered its verdict.

A defendant " 'may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' " (*People v. Alcala* (1992) 4 Cal.4th 742, 805-806 (*Alcala*); *Hayes, supra*, 229 Cal.App.3d at pp. 1231-1232; *Guillen, supra*, 37 Cal.App.3d at pp. 984-985.) We reject defendant's claim because he failed to timely inform the trial court that he wanted to testify.

Even if we assume defendant was denied his constitutional right to testify, there is no prejudice in this case. The denial of the right to testify is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*). (*People v. Allen* (2008) 44 Cal.4th 843, 848, 871-872; *People v. Johnson* (1998) 62 Cal.App.4th 608, 634-636.) Under *Chapman*, the denial of a defendant's right to testify is harmless error if it can be shown beyond a reasonable doubt that the error did not contribute to the guilty verdict. (*Johnson, supra,* 62 Cal.App.4th at p. 635.) The exclusion of a defendant's testimony is harmless if the facts to which the defendant offered to testify would not have affected the verdict. (*Allen, supra*, 44 Cal.4th at p. 872.)

Defendant testified, in connection with his motion for a new trial, that if he had taken the stand at trial he would have explained the "reasonings" for the actions the

9

surveillance team observed on September 15. In particular, defendant wanted to tell the jury why he was in the bank parking lot at the time of the robbery. Defendant said he would have testified he was at the bank parking lot to pick up Josh because Josh asked defendant to pick up Josh at their "meeting spot" where defendant picked up Josh every day. But those facts were actually presented to the jury.

The jury watched a recording of defendant's September 15 police interview. During that interview, defendant explained that Josh asked defendant to pick him up at the Redding Inn. Defendant said he stopped at the bank parking lot, which was near Redding Inn, to look for Josh and because defendant needed to urinate. Defendant said he had picked up Josh at the Redding Inn many times. At his second police interview, defendant again told police that Josh called defendant and asked defendant to pick him up at the Redding Inn. Defendant said he drove to the Redding Inn, did not see anyone there, stopped at the bank to urinate, circled around, left to go home, and was then stopped by police.

In sum, defendant explained to police why he was at the bank parking lot, and that portion of his police interview was played to the jury. Any error in defendant not taking the stand is harmless because the facts to which defendant said he would have testified were actually presented to the jury.

II

Defendant also contends the trial court erred in admitting uncharged conduct evidence for the purpose of explaining why defendant was under surveillance.

The People sought to admit evidence that (1) defendant had 10 prior robbery or attempted robbery convictions; (2) an employee of a medical marijuana collective saw a white Range Rover driven by a black male cruise slowly past her collective, as if "casing" it, the day before the Trusted Friends robbery; and (3) defendant was involved in the Northern Patient's Group robbery. The People sought to admit the above uncharged conduct evidence for two purposes. The People wanted to show, pursuant

10

to Evidence Code section 1101, subdivision (b), defendant's knowledge that Josh and E. were committing a robbery at Trusted Friends; defendant intended to assist in that robbery by acting as a lookout; there was a common plan in that the Trusted Friends robbery was similar to the robberies defendant previously committed; and the absence of mistake. In addition, the People sought to present the uncharged conduct evidence for the nonhearsay purpose of explaining why the police were following defendant on September 15.

The trial court admitted the uncharged conduct evidence under Evidence Code section 1101, subdivision (b). Defendant does not challenge that ruling. However, defendant challenges the trial court's ruling that the uncharged conduct evidence is admissible to explain why the police were surveilling defendant.

Only relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The reasonableness of the determination by law enforcement officials to follow defendant is irrelevant to any disputed issue in the trial. (*People v. Lucero* (1998) 64 Cal.App.4th 1107, 1109-1110 [it is error to admit evidence that a witness told the testifying officer the robber left a particular shoeprint for the purpose of explaining why the officer lifted that shoe print where the good faith or reasonableness of the officer's conduct had no tendency in reason to prove any disputed issue of fact in the action].) The prosecutor argued it was important for the jury to know why the police were watching defendant because, without the uncharged conduct evidence, the jury may believe defendant was a "law abiding citizen who has become inexplicably the focus of all this police attention" and the jury might "speculate about race and maybe the Redding police are focusing on him because he's African-America[n]." But defendant did not claim the police were acting in bad faith in following defendant. Accordingly, it was error for the trial court

11

to admit the uncharged conduct evidence for the purpose of explaining why the police had defendant under surveillance.

Defendant claims the admission of evidence about why police suspected he was involved in the medical marijuana collective robberies -- i.e., his prior robbery convictions and evidence tying him to the Northern Patients Group robbery -- rendered his trial fundamentally unfair; therefore, the *Chapman, supra,* 386 U.S. 18 [17 L.Ed.2d 705] standard of prejudice applies. We disagree.

Criminal propensity is not the only inference to be drawn from the uncharged conduct evidence. As defendant acknowledges, the uncharged conduct evidence was also admitted, pursuant to Evidence Code section 1101, subdivision (b), to show intent, motive, common plan or scheme, and absence of mistake or accident. Defendant does not challenge the trial court's ruling that the uncharged conduct evidence is relevant for those purposes.

The trial court repeatedly instructed the jury it may not use uncharged crime evidence to conclude that defendant was more likely to have committed the charged crimes because he committed the uncharged crimes. The trial court instructed that other crimes evidence admitted for the purpose of showing intent, motive, common plan or scheme, and absence of mistake or accident was not sufficient, by itself, to prove defendant's guilt of the charged crimes. We presume the jury followed the trial court's instructions on the limited use of uncharged conduct evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.)

Moreover, the trial court allowed defendant to present evidence about other marijuana collective robberies and burglaries in Redding in the summer of 2011 in order to argue that third parties, and not defendant, committed the Trusted Friends robbery. Under these circumstances, the admission of evidence about the reasons for the surveillance of defendant did not render defendant's trial fundamentally unfair.

12

"[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) We review error in admitting irrelevant evidence under the *People v. Watson* (1956) 46 Cal.2d 818 standard of prejudice. We must determine whether it is reasonably probable, in light of the other evidence, that the jury would have reached a result more favorable to the defendant had the challenged evidence been excluded. (*Alcala, supra,* 4 Cal.4th at p. 797.)

Even if it was error to admit the uncharged conduct evidence, it is not reasonably probable defendant would have obtained a more favorable result. Defendant procured the car which C., Josh, and E. used in the Trusted Friends robbery. Phone records indicate defendant, C., and Josh coordinated their movements near Trusted Friends before the robbery, and defendant spoke with Josh on his cell phone during the robbery. Defendant was at the Union Bank parking lot, which was near Trusted Friends. E. saw Josh talking on a cell phone before the robbery. E. heard Josh say, "we're here" into his cell phone. Although he later recanted, E. told police he heard Josh say "is it clear? Are we, are we good to go?" into his cell phone. Witnesses inside Trusted Friends saw one of the robbers held a cell phone to his ear during the robbery. Defendant left the bank parking lot about 30 seconds before Officer Jacoby received a report that Trusted Friends had been robbed.

C. told police defendant recruited C. to drop off Vanessa Pride's car for Josh to use in a robbery. C. recanted his police statement at the trial. But, according to C.'s aunt, C. confided that he and defendant were involved in the Trusted Friends robbery. The jury was entitled to discredit C.'s trial testimony and believe his statement to police implicating defendant.

A reasonable trier of fact could find defendant procured the getaway vehicle for the Trusted Friends robbery and acted as a lookout for C., Josh and E. A rational fact finder could also conclude defendant lied to police, evincing a guilty conscience. Defendant was untruthful to police, during his first interview, about what he was doing

13

just prior to stopping at the bank parking lot. Defendant told police he drove around Martin Luther King park looking for C. and Josh. However, the officers who were following defendant did not see defendant drive near the park.

Considering the evidence of defendant's guilt, the trial court's instructions with regard to the limited use of uncharged conduct evidence, and the admission of third party culpability evidence, we conclude the error in admitting uncharged conduct evidence for the purpose of explaining why defendant was under surveillance does not require reversal of the judgment.

III

Defendant next argues the trial court erred in excluding impeachment evidence relating to Officer Jacoby.

The People moved in limine to exclude evidence that Officer Jacoby had a six-year-old conviction for misdemeanor DUI, arguing that misdemeanor DUI is not a crime of moral turpitude. Defendant responded it was Officer Jacoby's attempt to bribe a public official during the DUI investigation which was significant, not the fact of Officer Jacoby's misdemeanor conviction. Defendant's trial counsel argued the attempted bribery incident was relevant to Officer Jacoby's credibility "and whether or not that failed attempt in his continued employment with the Redding Police Department has an affect [*sic*] on his motives insofar as what he might testify to and how he might conduct an investigation, the kinds of things he might do <u>or</u> not do, whether he might exaggerate in order to conform his testimony to what might be expect [*sic*] by his peers, his superiors or the People insofar as they are represented by the District Attorney's Office here."

Defendant offered to prove the following: Millville Fire Captain Scott Tassen encountered Officer Jacoby near a disabled vehicle on Highway 44 on March 24, 2006. Captain Tassen asked Officer Jacoby whether he was the only person who was in the disabled vehicle. Officer Jacoby said "no" but later changed his answer. Officer Jacoby asked Captain Tassen to tell dispatch the disabled vehicle was empty and to leave.

14

Captain Tassen declined. Officer Jacoby said, "Well, I've done lots of favors for the Millville Fire Department in the past. Why can't you do me a favor here?" Captain Tassen refused to leave. He waited for the arrival of the California Highway Patrol who conducted a DUI investigation.

The prosecutor argued Officer Jacoby's alleged misconduct did not constitute attempted bribery. The prosecutor further urged the proffered evidence was not probative of Officer Jacoby's credibility and its admission would require an undue consumption of time.

The trial court granted the People's in limine motion, concluding the alleged conduct was not an attempt to bribe a public official. The trial court said the alleged conduct was not much different than "a pretty girl trying to convince a male police officer by smiling at him and saying, 'Hey, can't you give a girl a break?' " The trial court also noted the alleged misconduct occurred six years prior. The trial court found the proffered evidence was not significantly probative and had a tendency to misdirect the jury.

Defendant contends the trial court erred in concluding Officer Jacoby's alleged misconduct does not constitute bribery. No error occurred in this respect. A "bribe" is "anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." (§ 7, subd. (6); *People v. Gaio* (2000) 81 Cal.App.4th 919, 928-929 [bribery is the giving or receipt of something of value with the intent of influencing the recipient's official vote, action, or opinion].) Defendant's offer of proof does not show that Officer Jacoby gave or offered to give Captain Tassen something of value with the intent of influencing Captain Tassen's official action.

Defendant says even if Officer Jacoby's conduct does not amount to bribery, it is an act of moral turpitude with which Officer Jacoby could be impeached. We agree

15

a jury could reasonably infer from defendant's offer of proof that Officer Jacoby was dishonest and, thus, not worthy of credit. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296, fn. 6 (*Wheeler*), superseded by statute on another point as noted in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459-1461 [impeaching misconduct need not constitute a crime]; *People v. Mickle* (1991) 54 Cal.3d 140, 168; *People v. Alcalde* (1944) 24 Cal.2d 177, 184-185.) Nonetheless, we conclude defendant has not established error.

Even if Officer Jacoby's alleged misconduct involves moral turpitude, admission of such evidence is subject to the trial court's discretion, under Evidence Code section 352, to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, confusing the issues, or misleading the jury. (Evid. Code, § 352; *People v. Quartermain* (1997) 16 Cal.4th 600, 623 ["notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352"]; *Wheeler, supra*, 4 Cal.4th at pp. 295-296.) Here, the trial court found the alleged misconduct by Officer Jacoby was remote, had a tendency to misdirect the jurors, and was not significantly probative. There is no evidence in the record that, unlike the alleged 2006 DUI incident, Officer Jacoby had a motive to lie in this case. Defendant asserts the trial court abused its discretion under Evidence Code section 352. But he fails to provide any analysis supporting the claim and, thus, forfeits it. (*People v. Whalen* (2013) 56 Cal.4th 1, 72, fn. 28; *People v. Earp* (1999) 20 Cal.4th 826, 881; *People* v. *Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.) Defendant thereby fails to show the trial court erred in excluding evidence of the alleged misconduct by Officer Jacoby.

We would conclude any error is harmless beyond a reasonable doubt even if we view the exclusion of the proffered evidence as constitutional error, as defendant urges. The exclusion of cross-examination designed to attack the credibility of a witness violates a defendant's constitutional right to confront witnesses if the prohibited cross-

16

examination would have produced a significantly different impression of the witness's credibility. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 684].) Improper denial of cross-examination requires reversal unless the error was harmless beyond a reasonable doubt. (*Id.* at p. 684 [89 L.Ed.2d at p. 686].) Whether the constitutionally improper exclusion of impeachment evidence is harmless depends on factors including the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. (*Ibid.*)

While Officer Jacoby's testimony is important to the prosecution's case, other evidence corroborates his testimony and establishes defendant's guilt. (*People v. Brown* (2003) 31 Cal.4th 518, 546 [finding any Confrontation Clause error harmless beyond a reasonable doubt where witness's testimony was largely consistent with that of other witnesses and other evidence supported the defendant's guilt].) Officer Jacoby's testimony established defendant stopped at the bank parking lot, he appeared to talk on a cell phone, and he looked in the direction of Trusted Friends. Defendant admitted to police he was at the bank parking lot near Trusted Friends during the robbery. A recording of radio communication between members of the surveillance team, which was played to the jury, also corroborates Officer Jacoby's testimony that defendant stopped at the bank parking lot and the Trusted Friends robbery was reported after defendant left the bank parking lot. People's exhibit 30 shows the front of Trusted Friends was visible from the bank. While no other witness testified about where defendant looked when he was at the bank parking lot, defendant admitted he was talking to Josh during the robbery. Cell phone records confirm the communications between defendant and Josh immediately before and during the commission of the Trusted Friends robbery, when police saw defendant at the bank parking lot and when E. and the victims saw Josh talking on a cell

17

phone. E. testified he waited for Josh, who was speaking on a cell phone, to give E. the "go-ahead" for the robbery. In addition, the testimonies of Officer John Thulin, Vanessa Pride, C., and E. establish defendant obtained the car used in the Trusted Friends robbery. And C. implicated defendant in the Trusted Friends robbery in one of his statements to police and in a statement to his aunt.

Further, defendant discredited Officer Jacoby's testimony in other ways. Officer Jacoby admitted, during cross-examination, he could not remember exactly how many times the Charger left the apartment complex and he did not observe defendant the entire time defendant was at the bank parking lot. Defendant's trial counsel argued to the jury that Officer Jacoby and the police concluded defendant was involved in the marijuana collective robberies based on his prior convictions, and the police conducted an inadequate investigation. Defendant's trial counsel criticized Officer Jacoby for not wearing a watch, not paying attention to what defendant was doing, and not documenting his observations. He challenged Officer Jacoby's testimony that defendant was parked at the bank when the Trusted Friends robbery occurred. He also attacked the prosecution's theory that defendant acted as a look-out, arguing defendant could not see a particular street and the back of Trusted Friends from his alleged position at the bank parking lot.

We conclude there was no prejudicial error.

IV

Defendant further argues the trial court erred in refusing to dismiss his prior strike convictions.

Defendant had 10 prior strike convictions. One relates to a robbery that occurred on July 30, 1999, in Lassen County. The other nine strikes relate to second degree robberies or attempted second degree robberies that occurred on four dates in April 2000, in Shasta County. Defendant moved to dismiss all but one of his prior strike convictions.

The trial court denied defendant's motion. It said the current offenses were serious and violent felonies. Defendant used minors to commit the Trusted Friends

18

robbery, his crimes were sophisticated in nature, and he committed numerous prior robberies. There was no significant break in his prior serious or violent conduct. According to the trial court, defendant had been in prison or committing crimes as an adult and granting his motion would subvert the purposes of the three strikes law.

Defendant contends the trial court abused its discretion in not dismissing his prior strike convictions because nine of the strike priors arose from crimes committed during a "short continuous period of law breaking" and "a short period of aberrant behavior."

A trial court may dismiss an allegation or finding under the Three Strikes law that the defendant has previously been convicted of a serious and/or violent felony, on its own motion, " ' "in furtherance of justice" ' " pursuant to section 1385. (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*).) We review the trial court's section 1385 ruling for abuse of discretion. (*Id.* at pp. 373-376.) This standard is deferential. (*People v. Williams* (1998) 17 Cal.4th 148, 162.) We presume the trial court's section 1385 ruling is proper. (*Carmony, supra*, 33 Cal.4th at pp. 376-378.) The party attacking the sentence bears the burden of clearly showing the trial court's ruling is unreasonable in light of the applicable law and the relevant facts. (*Id.* at p. 376; *Williams, supra*, 17 Cal.4th at p. 162.) " '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Carmony, supra*, 33 Cal.4th at pp. 378.) We do not substitute our judgment for that of the trial court, and we will not reverse the trial court's sentencing decision merely because reasonable people might disagree. (*Id.* at pp. 377-378.)

" '[T]he Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as

19

though he actually fell outside the Three Strikes scheme." ' [Citation.] [¶] Consistent with the language of and the legislative intent behind the three strikes law, we have established stringent standards that sentencing courts must follow in order to find such an exception. '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to . . . section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*Carmony, supra,* 33 Cal.4th at p. 377.)

The record shows the trial court was aware of its discretion under section 1385, and it considered relevant factors in deciding whether to dismiss the prior strike convictions. Taking into account the factors set forth in *Carmony, supra,* 33 Cal.4th 367, we conclude the trial court did not abuse its discretion when it declined to dismiss defendant's prior strike convictions. Defendant was armed with a shotgun during the 1999 Lassen County robbery. He was armed with a "plastic popper-type weapon" that looked like a real handgun during some of the 2000 Shasta County robberies. He pleaded guilty to the six counts of second degree robbery and three counts of attempted second degree robbery and received a reduced sentence of 11 years in prison. He committed additional felonies while in prison and received additional prison terms. He committed the present offenses, which involved the use of a firearm and minors, about seven months after he was released from prison and still on parole. There was evidence defendant helped Josh commit another marijuana collective robbery and that defendant shared in the proceeds of that robbery.

The cases defendant likens to his -- *People v. Burgos* (2004) 117 Cal.App.4th 1209 (*Burgos*) and *People v. Garcia* (1999) 20 Cal.4th 490 (*Garcia*) -- are distinguishable.  In *People v. Benson* (1998) 18 Cal.4th 24 (*Benson*), the California Supreme Court considered whether a prior strike conviction on which sentence was stayed pursuant to section 654 constitutes a strike under the three strikes law.  The Supreme Court ruled, based on the language, legislative history, and legislative purpose of the three strikes law, that a qualifying prior conviction on which sentence was stayed is nevertheless a strike prior.  (*Benson*, at pp. 26-27.)  The Supreme Court observed, however, that a trial court retains its discretion to strike a prior felony conviction under section 1385.  (*Benson*, at p. 36.)  The Supreme Court did not decide in that case "whether there are some circumstances in which two prior felony convictions are so closely connected -- for example, when multiple convictions arise out of a single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct -- that a trial court would abuse its discretion under section 1385 if it failed to strike one of the priors."  (*Benson*, at p. 36, fn. 8.)

Relying on the *Benson* dicta*,* the appellate court in *Burgos* held it was an abuse of discretion for the trial court not to strike one of the defendant's prior strikes where, among other things, those strikes arose from a single criminal act.  (*Burgos, supra,* 117 Cal.App.4th at pp. 1216-1217.)  But unlike in *Burgos*, the record here does not establish that any two or more of defendant's strike priors arose from a single criminal act.  The Lassen and Shasta County strike priors involve different victims and/or different dates.  Unlike the strike priors in this case, the strikes in *Burgos* were against one victim and were committed during a single incident.  (*Id.* at p. 1212, fn. 3.)  The *Benson* dicta and *Burgos* do not apply to this case.

In *Garcia*, the trial court exercised its discretion under section 1385 to dismiss prior conviction allegations with respect to one count but not another.  (*Garcia, supra*, 20 Cal.4th at pp. 492-493.)  The California Supreme Court rejected the Attorney

General's claim that the trial court's decision was an abuse of discretion. (*Id.* at pp. 493, 503.) The Supreme Court noted the defendant's prior convictions arose from a single period of aberrant behavior for which he served a single prison term, the defendant cooperated with police, his crimes were related to drug addiction, and his criminal history did not include any actual violence. (*Id.* at p. 503.) The Supreme Court said those circumstances indicate the defendant may be deemed outside the spirit of the three strikes law, at least in part. (*Ibid.*)

In contrast with the prior strikes in *Garcia,* defendant's April 2000 Shasta County crimes are not aberrant behavior or a single instance of criminality because about nine months prior to the April 2000 crimes defendant committed an armed robbery in Lassen County. Additionally, defendant committed the current offenses about seven months after he was released from prison in connection with the sentence on his prior strike convictions. And defendant was still on parole at the time of this robbery. Also unlike the prior strikes in *Garcia,* defendant's April 2000 prior strikes were not committed on the same day. (*Garcia, supra*, 20 Cal.4th at p. 493.) The April 2000 prior strikes were committed on different dates against different victims, except for two crimes which were committed against the same victim but on different dates. Unlike the defendant in *Garcia*, defendant did not cooperate with police in this case. And defendant's criminal history includes the use of a firearm or apparent firearm.

We will not disturb the trial court's exercise of discretion.

V

In addition, defendant contends he should have received 734 days of presentence credit rather than 633 because he was continuously in custody from the time of his September 15 arrest until his June 14, 2013, sentencing hearing. Defendant says he is

22

entitled to presentence credit consisting of 639 actual custody days and 95 conduct days pursuant to section 2933.1.**4**

Defendant received 633 days of presentence credit, which the trial court found consisted of 551 actual days in custody and 82 conduct days. His trial counsel did not raise any issue concerning presentence credit.

Defendant correctly observes this court can correct computational errors in the calculation of presentence credit. (*People v. Duran* (1998) 67 Cal.App.4th 267, 270.) But the record does not show how many days defendant was actually in custody following his September 15 arrest. The trial court is in the best position to resolve this factual issue. (See *People v. Fares* (1993) 16 Cal.App.4th 954, 958-960.) We will remand the matter to the trial court to determine the number of days defendant spent in custody and to adjust his presentence credit if appropriate. (*People v. Muniz* (1993) 16 Cal.App.4th 1083, 1088; *People v. Wischemann* (1979) 94 Cal.App.3d 162, 175.)

DISPOSITION

We remand the matter to the trial court to determine all actual days defendant has spent in custody on this matter, to award any presentence credit to which defendant

---

**4** Section 2933.1 provides, "(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5[, which includes robbery,] shall accrue no more than 15 percent of worktime credit, as defined in Section 2933. [¶] (b) The 15-percent limitation provided in subdivision (a) shall apply whether the defendant is sentenced under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2 or sentenced under some other law. However, nothing in subdivision (a) shall affect the requirement of any statute that the defendant serve a specified period of time prior to minimum parole eligibility, nor shall any offender otherwise statutorily ineligible for credit be eligible for credit pursuant to this section. [¶] (c) Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)."

23

is entitled, and to prepare, if necessary, an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.


                                                  _____/S/_____
                                                  MAURO, J.


I concur:


_____/S/_____
NICHOLSON, Acting P. J.

MURRAY, J., Concurring.

I concur with the majority opinion except for the reasoning in part III of the Discussion.

I agree with the majority that, "a jury could reasonably infer from defendant's offer of proof that Officer Jacoby was dishonest and, thus, not worthy of credit." (Maj. opn., *ante*, at p. 16.) But I cannot agree with the majority's view of the trial court's Evidence Code section 352 balancing analysis. The focus of the trial court in determining the probative value of this evidence appears to have been on Jacoby's personal motivation to avoid prosecution and that Jacoby's conduct did not constitute a crime. In explaining its ruling, the trial court said, " 'I've done you guys favors in the past, can't you do one for me,' it's just a more specific way of saying give me a break. I'm a fellow law enforcement officer. Give me a break. [¶] . . . That's not much different than a pretty girl trying to convince a male police officer by smiling at him and saying 'Hey, can't you give a girl a break?' I don't think I'd allow any impeachment for that. And if it was the other way around, one sex as to the other or any other type of persuasion, that doesn't amount to committing a crime, I don't think I would consider allowing impeachment with that."

The offer of proof included evidence that Officer Jacoby suggested that Captain Tassen lie to his department by telling dispatch the vehicle Tassen found was abandoned. When Tassen said he could not do that, Jacoby said, " 'Well, I've done lots of favors for the Millville Fire Department in the past. Why can't you do me a favor here?' " In context, an inference could be drawn from this comment that Officer Jacoby gave breaks to other people who may have broken the law in the past. In this respect, the proffered evidence is not the same as a smiling "pretty girl" asking for a break. The evidence tends to show that Jacoby saw nothing wrong with Tassen being dishonest with his department while acting in an official capacity, and from that, an inference could be drawn that Jacoby himself might also be dishonest when acting in an official capacity. Furthermore,

1

the statement about having done favors in the past, in context, tends to show a greater degree of corruption than just a personal motivation to avoid criminal prosecution by invoking his status as a law enforcement officer. It tends to show he may have enforced the law in the past based on who the offending individual may have been. These things were not considered or factored into the trial court's probative value analysis.

Nevertheless, I concur in the result in part III of the Discussion and the harmless error analysis. Even if it was error to exclude Officer Jacoby's corrupt conduct, that error was harmless.

/S/
MURRAY, J.

2